**AMENDED ASSET PURCHASE AGREEMENT**

**by and among**

**DYNACQ HEALTHCARE, INC.,**

**VISTA COMMUNITY MEDICAL CENTER, L.L.P.,**

**VISTA LAND & EQUIPMENT, L.L.C.,**

**DOCTORS PRACTICE MANAGEMENT, INC.,**

**SURGERY SPECIALTY CLINICIANS, INC.,**

**VISTA HOSPITAL OF DALLAS, L.L.P.,**

**and**

**AMBULATORY INFUSION THERAPY SPECIALISTS, INC.,**

**as Sellers,**

**and**

**GRAYSTREET BIB CREDIT, LLC,**

**as GrayStreet Buyer,**

**and**

**LEGENT HOSPITAL NORTHWEST HOUSTON, LLC,**
**D/B/A LEGENT NORTH HOUSTON SURGICAL HOSPITAL,**

**as Legent Buyer.**

**March 20, 2026**

**TABLE OF CONTENTS**

**Page**

**ARTICLE I. DEFINITIONS** ..................................................................................2

**ARTICLE II. PURCHASE AND SALE** ...............................................................10

Section 2.1     Purchase and Sale of Purchased Assets ....................................10

Section 2.2     Excluded Assets.........................................................................12

Section 2.3     Assumption of Assumed Liabilities............................................13

Section 2.4     Excluded Liabilities ...................................................................14

Section 2.5     Consideration.............................................................................14

Section 2.6     Assumption and Assignment of Contracts; Excluded Locations ...................15

Section 2.7     Closing.......................................................................................16

Section 2.8     Deliveries at Closing..................................................................16

Section 2.9     Allocation ..................................................................................19

**ARTICLE III. SELLERS' REPRESENTATIONS AND WARRANTIES**............................19

Section 3.1     Organization of Sellers; Good Standing .....................................19

Section 3.2     Authorization of Transaction......................................................19

Section 3.3     Non-contravention .....................................................................20

Section 3.4     Compliance with Laws ...............................................................20

Section 3.5     Title to Purchased Assets...........................................................20

Section 3.6     Contracts....................................................................................20

Section 3.7     Intellectual Property...................................................................20

Section 3.8     Litigation....................................................................................21

Section 3.9     Healthcare Matters......................................................................21

Section 3.10    Physician-Owned Hospital. ........................................................22

Section 3.11    RESERVED.................................................................................23

Section 3.12    Taxes..........................................................................................24

Section 3.13    Brokers' Fees .............................................................................24

Section 3.14    No Other Representations or Warranties......................................24

**ARTICLE IV. BUYER'S REPRESENTATIONS AND WARRANTIES**............................25

Section 4.1     Organization of Buyer ................................................................25

Section 4.2     Authorization of Transaction......................................................25

i

Section 4.3    Non-contravention ................................................................................26

Section 4.4    Financial Capacity ...............................................................................26

Section 4.5    Litigation..............................................................................................26

Section 4.6    Adequate Assurances Regarding Executory Contracts ...................27

Section 4.7    Good Faith Purchaser .........................................................................27

Section 4.8    Brokers' Fees ......................................................................................27

Section 4.9    Condition of Business .........................................................................27

**ARTICLE V. PRE-CLOSING COVENANTS** ........................................................................**27**

Section 5.1    Certain Efforts; Cooperation...............................................................28

Section 5.2    Notices and Consents..........................................................................28

Section 5.3    Bankruptcy Actions .............................................................................29

Section 5.4    Conduct of Business ............................................................................31

Section 5.5    Certain Restricted Conduct.................................................................32

Section 5.6    Notice of Developments .......................................................................33

Section 5.7    Contracts ..............................................................................................33

**ARTICLE VI. OTHER COVENANTS** .....................................................................................**33**

Section 6.1    Cooperation..........................................................................................34

Section 6.4    Further Assurances ..............................................................................34

Section 6.5    Availability of Business Records.........................................................35

Section 6.6    Use of Name and Marks ......................................................................35

Section 6.7    Data Privacy Protection ......................................................................35

**ARTICLE VII. CONDITIONS TO CLOSING** ........................................................................**36**

Section 7.1    Conditions to Buyer's Obligations .....................................................36

Section 7.2    Conditions to Sellers' Obligations......................................................36

Section 7.3    No Frustration of Closing Conditions.................................................37

**ARTICLE VIII. TERMINATION** .............................................................................................**37**

Section 8.1    Termination of Agreement ..................................................................37

Section 8.2    Procedure Upon Termination .............................................................39

Section 8.3    Effect of Termination ..........................................................................39

**ARTICLE IX. MISCELLANEOUS**...........................................................................................**39**

Section 9.1    Remedies...............................................................................................39

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

Section 9.2     Expenses ..................................................................................................40

Section 9.3     Entire Agreement......................................................................................40

Section 9.4     Incorporation of Schedules, Exhibits and Disclosure Schedule .....................40

Section 9.5     Amendments and Waivers.........................................................................40

Section 9.6     Succession and Assignment.......................................................................41

Section 9.7     Notices ....................................................................................................41

Section 9.8     Governing Law; Jurisdiction .....................................................................42

Section 9.9     Severability .............................................................................................43

Section 9.10    No Third-Party Beneficiaries....................................................................43

Section 9.11    No Survival of Representations, Warranties and Agreements ......................43

Section 9.12    Construction............................................................................................43

Section 9.13    Computation of Time................................................................................44

Section 9.14    Mutual Drafting ......................................................................................44

Section 9.15    Disclosure Schedule.................................................................................44

Section 9.16    Non-Recourse. ........................................................................................44

Section 9.17    Headings; Table of Contents .....................................................................44

Section 9.18    Counterparts; Facsimile and Email Signatures................................................44

Section 9.19    Time of Essence......................................................................................44

## **EXHIBITS**

EXHIBIT A-1
LEGENT BUYER BILL OF SALE

EXHIBIT A-2
GRAYSTREET BUYER BILL OF SALE

EXHIBIT B-1
LEGENT BUYER ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT B-2
GRAYSTREET BUYER ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT C
TRADEMARK ASSIGNMENT AGREEMENT

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

EXHIBIT D
DOMAIN NAME ASSIGNMENT AGREEMENT

EXHIBIT E
RESERVED

EXHIBIT F
REAL PROPERTY DEED

EXHIBIT G
ASSUMED LICENSES AND PERMITS

EXHIBIT H
REGULATORY FILINGS

EXHIBIT I
NON-FOREIGN STATUS AFFIDAVIT

EXHIBIT J
ALLOCATION SCHEDULE

**SCHEDULES**

Schedule 1(a)
GrayStreet Permitted Liens

Schedule 1(b)
Legent Permitted Liens

Schedule 2.1(a)(i)
Real Property

Schedule 2.1(a)(ii)
Leases

Schedule 2.1(b)(i)
Personal Property

Schedule 2.5(a)(iii)
Assumed Liabilities

Schedule 2.6(a)(i)
Contracts and Cure Amounts

Schedule 3.3
Regulatory Filings

iv

Schedule 3.4
Exceptions to Compliance with Laws

Schedule 3.6
Assumed Contracts

Schedule 3.7
Intellectual Property

Schedule 3.8
Litigation

Schedule 3.9
Permits

Schedule 3.10(b)
Number of operating rooms, procedure rooms, and beds

Schedule 3.10(d)
Physician Ownership

Schedule 5.4
Conduct of Business

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**AMENDED ASSET PURCHASE AGREEMENT**

This **AMENDED ASSET PURCHASE AGREEMENT** (this "Agreement") by and among Dynacq Healthcare, Inc., a Nevada corporation ("Dynacq"); Vista Community Medical Center, L.L.P., a Texas limited liability partnership ("VCMC"); Vista Land & Equipment, L.L.C., a Texas a Texas limited liability company ("VLE"); Doctors Practice Management, Inc., a Texas corporation ("DPM"); Surgery Specialty Clinicians, Inc., a Texas corporation ("SSC"); Vista Hospital of Dallas, L.L.P., a Texas limited liability partnership ("VHD"); and Ambulatory Infusion Therapy Specialists, Inc., a Texas corporation ("AITS" and together with Dynacq, VCMC, VLE, DPM, SSC, and VHD, the "Sellers" and each individually, a "Seller"), GrayStreet BIB Credit, LLC ("GrayStreet Buyer"), and Legent Hospital Northwest Houston, LLC, d/b/a Legent North Houston Surgical Hospital ("Legent Buyer") (GrayStreet Buyer and Legent Buyer are referred to herein collectively as the "Buyer"; and Seller together with Buyer are, collectively, referred to as the "Parties" and each, individually, a "Party") is dated effective as of March 20, 2026 (the "Effective Date"). Sellers and Buyer are referred to herein collectively as the "Parties".

## RECITALS

**WHEREAS**, certain terms used in this Agreement are defined in ARTICLE I;

**WHEREAS**, Sellers own and operate a Hospital and medical office building located at 4301 Vista Road, Pasadena, TX 77504 (the "Business");

**WHEREAS**, on December 8, 2025 (the "Petition Date"), Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11, title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") where the Sellers' Chapter 11 Cases are jointly administered under Case No. 25-90798 (ARP);

**WHEREAS**, this Agreement is subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to the Bidding Procedures set forth in the *Order (I) Approving (A) Bidding Procedures; (B) Assumption and Assignment Procedures; and (C) Stalking Horse Procedures and Bid Presentations; (II) Scheduling Bid Deadline Auction Date and Sale Hearing Date; (III) Approving Forms of Notice Thereof; and (IV) Granting Related Relief* [Docket No. 100] entered by the Bankruptcy Court on January 13, 2026 (the "Bidding Procedures Order");

**WHEREAS**, pursuant to the Bidding Procedures, Sellers shall conduct an Auction and sale process, as ordered by the Bankruptcy Court in the Bidding Procedures Order, to determine the highest or otherwise best offer for the Purchased Assets;

**WHEREAS**, the Contemplated Transactions are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court;

1

**WHEREAS**, subject to approval of the Bankruptcy Court, Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Purchased Assets and the Assumed Liabilities as of the Closing; and

**WHEREAS**, subject to approval of the Bankruptcy Court, on the Closing Date Buyer will acquire certain assets and assume certain liabilities of the Business of Sellers in accordance with the terms of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

**AGREEMENT**

**ARTICLE I.**
**DEFINITIONS**

**Section 1.1**     Definitions.

The following terms have the meanings specified or referred to in this ARTICLE 1:

"Accounts Receivable" means (a) all accounts, accounts receivable, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person, including those Persons defined and described as an Affiliate or "insider" in Section 101(31) of the Bankruptcy Code.

"Agreement" has the meaning set forth in the first paragraph of this Agreement.

"Allocation Schedule" has the meaning set forth in Section 2.9(a).

"Alternate Agreement" means one or more definitive agreements with respect to one or more Alternate Transactions.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers, consistent with the Bidding Procedures Order, (a) accept a Qualified Bid other than that of Buyer, as the highest or best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a Plan or refinancing, all or substantially all of the Purchased Assets or the equity interests of either Seller (or agree to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer.

"Ancillary Real Property" has the meaning set forth in Section 2.1(a)(i).

2

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

"Approved Budget" has the meaning set forth in Final DIP Order.

"Assigned Contract" has the meaning set forth in Section 2.6(a)(ii).

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" has the meaning set forth in Section 2.1(b)(iv).

"Auction" means an auction for the sale and assumption of the Purchased Assets and the Assumed Liabilities.

"Back-Up Bid" has the meaning set forth in Section 5.3(c).

"Back-Up Bidder" has the meaning set forth in Section 5.3(c).

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bid Deadline" has the meaning set forth in the Bidding Procedures Order.

"Bid Protections" has the meaning set forth in Section 5.3(a).

"Bidder" and "Bidder" means each party submitting a qualified bid in the Action, as set forth in the Bidding Procedures Order

"Bidding Procedures" means the procedures approved pursuant to the Bidding Procedures Order establishing the bidding and auction procedures to be followed by Sellers and all potential bidders in connection with the Debtors' marketing and sale process.

"Bidding Procedures Order" has the meaning set forth in the Recitals.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"Breakup Fee" has the meaning set forth in Section 5.3(a).

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in Houston, Texas shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the first paragraph of this Agreement.

"Cash" means all cash and cash equivalents of Sellers as of the Closing.

3

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Claim" or "claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"Committee" means the Official Committee of Unsecured Creditors, if any, appointed in the Chapter 11 Cases.

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement, collective bargaining agreement, or other arrangement, understanding, permission or commitment that, in each case, is legally binding.

"Contract and Cure Schedule" has the meaning set forth in Section 2.6(a)(i).

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Cure Costs" means, for only the Assigned Contracts, all amounts that are determined by a Final Order of the Bankruptcy Court must be paid, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assigned Contracts to Buyer as provided herein.

"Debtors" means Sellers, as debtors and debtors in possession in the Chapter 11 Cases.

"Deposit" has the meaning set forth in Section 2.5(b).

"DIP Lender" means Caliburn Capital, LLC.

"DIP Obligations" means all "DIP Obligations" as defined in the Final DIP Order.

"Disclosure Schedules" has the meaning set forth in ARTICLE III.

4

"Effective Date" has the meaning set forth in the introductory paragraph to this Agreement.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means those Contracts and Leases which are not assumed by Sellers and assigned to Buyer as Assigned Contracts.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Expense Reimbursement" has the meaning set forth in Section 5.3(a).

"Final DIP Order" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 84] entered by the Bankruptcy Court on January 6, 2026.

"Final Order" means an order, an order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction or other similar determination or finding by, before, or under the supervision of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (ii) with respect to which no stay shall have been issued in connection with any notice of appeal or petition for certiorari filed within any deadline provided by applicable Law and any deadline provided by applicable Law to file any such a notice of appeal or petition for certiorari shall have passed without any such a notice of appeal or petition for certiorari having been filed.

"GrayStreet Assets" has the meaning set forth in Section 2.1(a).

"GrayStreet Permitted Liens" means: (a) Liens for Taxes, assessments and other governmental levies, fees and charges not yet delinquent or which are being contested in good faith by appropriate proceedings, with any such contests and the amounts at issue with respect thereto, (b) with respect to leased or licensed personal property, the terms and conditions of the leases or licenses applicable thereto to the extent constituting an Assigned Contract, (c) with respect to the Real Property, any laws, licenses, permits, special permits, variances and other instruments, relating to zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted, and (d) Liens securing the DIP Obligations; each as set forth on Schedule 1(a).

"Governmental Authority" means any governmental entity, including the United States federal, state, local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Hospital" means that certain Medicare-certified, physician-owned hospital located at 4301 Vista Road, Pasadena, TX 77504.

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

"Indebtedness" of any Person means, without duplication, (i) the principal, interest and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds, or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services or goods acquired in the Ordinary Course of Business), all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the Ordinary Course of Business); (iii) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance, or similar credit transaction; (iv) all obligations of the type referred to in clauses (i) through (iii) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person); provided, however, for the avoidance of doubt "Indebtedness" shall not include any obligations of such Person under leases required to be capitalized in accordance with GAAP.

"Insurance Policy" means each primary, excess and umbrella insurance policy, professional liability insurance policy, bond and other form of insurance owned or held by or on behalf of Sellers and their operations, properties and assets, or providing insurance coverage to the Business.

"Intellectual Property" has the meaning set forth in Section 2.1(b)(ii).

"Intellectual Property Assignments" has the meaning set forth in Section 2.8(a)(iv).

"IP Lease Assignments" has the meaning set forth in Section 2.8(a)(v).

"IRS" means the Internal Revenue Service.

"Knowledge of Buyer" or "Buyer's Knowledge" or any other similar knowledge qualification, means the actual knowledge of any Representative of Buyer.

"Knowledge of Sellers" or "Sellers' Knowledge" or any other similar knowledge qualification, means the actual knowledge of any Representative of any Seller.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Order of any Governmental Authority.

"Legent Assets" has the meaning set forth in Section 2.1(b).

"Legent Permitted Liens" means: (a) with respect to leased or licensed personal property, the terms and conditions of the leases or licenses applicable thereto to the extent constituting an Assigned Contract, and (b) Liens securing the DIP Obligations; each as set forth on Schedule 1(b).

"Liability" means all Indebtedness, losses, claims, damages, expenses, fines or other penalties, costs, royalties, proceedings, deficiencies, duties, obligations, and other liabilities

6

(including those arising out of any Litigation, such as any settlement or compromise thereof or judgment or award therein) of a Person (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, and whether known or unknown, and whether due or to become due, and whether in contract, tort, strict liability, or otherwise, and whether or not resulting from third-party claims).

"Licenses" means any approval, authorization, consent, license, order, permit, waiver, easement, qualification, grant, concession, exception, ruling, waiver, variance, registration, provider number, certificate or other form of permission, or similar right issued, granted, given or otherwise obtained from or by any Governmental Authority, under the authority thereof or pursuant to any applicable Law, including the status of the Hospital as a grandfathered physician-owned hospital under the Affordable Care Act.

"Lien" as applied to any Person means, with respect to any property or asset, any mortgage, deed of trust, lien (statutory or otherwise), encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance Lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at Law or in equity and whether before any Governmental Authority or arbitrator.

"Lookback Date" means March 1, 2020.

"Material Adverse Effect" means any event, occurrence, fact, condition, or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to the Purchased Assets, in each case taken as a whole, but excluding (a) any change or effect to the extent that it results from or arises out of (i) the pendency of the Chapter 11 Cases or the financial condition of Sellers; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the Contemplated Transactions; (iii) changes in (or proposals to change) Law, generally accepted accounting principles, or other accounting regulations or principles, or (iv) any action contemplated by this Agreement or taken at the request of Buyer; (b) any change or effect generally applicable to (i) the industries and markets in which Sellers operate; (ii) resulting from the Ordinary Course of Business; or (iii) economic or political conditions or the securities or financial markets in any country or region; (c) any outbreak or escalation of hostilities or war or any act of terrorism; (d) any occurrence, threat, or effects of a disease outbreak, epidemic, pandemic, or similar widespread public health concern, which results in recommendations or mandates from governmental authorities to reduce travel, avoid large gatherings, self-quarantine, or extended shutdown of certain businesses; (e) any objections in the Bankruptcy Court to (i) this Agreement and the Related Agreements and the transactions contemplated hereby and thereby, (ii) the reorganization of Sellers and any related plan of reorganization or disclosure statement, or (iii) the Bidding Procedures Order or Sale Order; (f) the assumption or rejection of any Assigned Contract; (g) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to

7

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

the other provisions of this definition) shall not be excluded); (h) any Order of the Bankruptcy Court or any actions or omissions of Sellers in compliance therewith; (i) any action taken by Sellers at the request of, or with the consent of, Buyer; (j) any of the matters disclosed on any Exhibit, Annex, Schedule, or Disclosure Schedules to this Agreement; and (k) any change of which Buyer has Knowledge as of the date hereof.

"Order" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of operations of the Business of Sellers (including acts and omissions of Sellers in the ordinary and usual course), subject to any modifications of such practice as a result of the filing of the Chapter 11 Cases, through the date hereof, consistent with past customer and practice, and operations in a bankruptcy.

"Parties" has the meaning set forth in the first paragraph of this Agreement.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Authority or any group or syndicate of any of the foregoing.

"Petition Date" means December 8, 2025, the date of the filing of the Chapter 11 Cases.

"PII" has the meaning set forth in Section 6.6.

"Plan" means a plan of reorganization or liquidation proposed by Sellers and/or any party in interest.

"Plan of Correction" has the meaning set forth in Section 2.8(a)(viii).

"Property" means collectively, the Personal Property, the Real Property and the Ancillary Real Property.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" means the GrayStreet Assets and the Legent Assets; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets.

"Purchased Intellectual Property" means any and all Intellectual Property owned by either Seller or its Affiliates or Subsidiaries, including all rights of action and remedies for past, present and future infringements thereof.

"Qualified Bid" has the meaning set forth in the Bidding Procedures Order.

"Qualified Bidder" has the meaning set forth in the Bidding Procedures Order.

8

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Registered" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Authority or domain name registrar.

"Related Agreements" means the Bills of Sale, the Assignment and Assumption Agreements, the Intellectual Property Assignments, the Post-Petition Contract Assignment Agreement, IRS Forms W-9, and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries, as of the Effective Date.

"Sale Hearing" means the hearing scheduled by the Bankruptcy Court in the Bidding Procedures Order to consider the sale of the Debtors' assets to a Winning Bidder.

"Sale Order" means an Order of the Bankruptcy Court in the Chapter 11 Cases approving the sale to Buyer consistent with the terms of this Agreement and otherwise acceptable to Buyer and Sellers.

"Sale Order Deadline" means March 18, 2026.

"Seller" or "Sellers" has the meaning set forth in the first paragraph of this Agreement.

"Seller Transaction Expenses" means the collective amounts payable by Sellers for all out-of-pocket fees and expenses incurred in connection with the preparation, negotiation, execution and consummation of the Contemplated Transactions.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. A Person or Persons own a majority ownership interest in a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all direct or indirect Subsidiaries of such Person.

9

"Tax" or "Taxes" means any United States federal, state or local or non-United States taxes, including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, liquor, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Texas HHS" has the meaning set forth in Section 2.8(a)(vii).

"Texas HHS Survery" has the meaning set forth in Section 2.8(a)(vii).

"Winning Bid" has the meaning set forth in the Bidding Procedures Order.

"Winning Bidder" has the meaning set forth in the Bidding Procedures Order.

**ARTICLE II.**
**PURCHASE AND SALE**

**Section 2.1**     **Purchase and Sale of Purchased Assets**.

(a)     GrayStreet Buyer Purchased Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, GrayStreet Buyer shall purchase, acquire, and accept from Sellers, on an "as is, where is" basis (except with respect to the representations and warranties made in ARTICLE III) and without any representation or warranty on the part of Sellers as to fitness, merchantability, or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to GrayStreet Buyer, all of Sellers' rights, title and interests in and to tangible and intangible real and personal property assets used or held for use by Sellers in the operation of the Business (the "GrayStreet Assets"), excluding the Excluded Assets and the Legent Assets, free and clear of all Liens (other than the GrayStreet Permitted Liens) and Liabilities (other than the Assumed Liabilities), for the consideration specified in Section 2.5. Without limiting the generality of the foregoing, the GrayStreet Assets shall include, without limitation, the following (except for the Excluded Assets and the Legent Assets):

(i)     Real Property. That certain tract of land located at 4301 Vista Rd Pasadena, Harris County, TX 77504, the legal description of which is set forth on Schedule 2.1(a)(i) attached hereto and made a part hereof, together with all right, title, and interest in and to all improvements, buildings, facilities, structures, parking lots, mechanical systems, and fixtures located on, attached to, and used in connection therewith (the "Real Property"), and together with all amenities, rights, privileges, easements, minerals, rights-of-way, open or proposed streets, alleys, easements, sidewalks and utility lines related to the Real Property (collectively, the "Ancillary Real Property").

10

(ii)   Leases; Security Deposits; Records. All of Sellers' right, title and interest, as landlord, in and to the written leases and tenancies granting any leasehold interest in and to the Real Property including, without limitation, all amendments, supplements, guaranties, or other similar documents, if any (collectively, the "Leases"), true, correct and complete copies of all such Leases are more particularly described on Schedule 2.1(a)(ii) attached hereto and made a part hereof, together with all security deposits and letters of credit in Sellers' or Sellers' representatives' possession or control due to the tenants under the Leases at the Real Property, if any (collectively, the "Security Deposits"), and together with all general ledger(s), accounting records and tenant files in Sellers' or Sellers' representatives' possession or control, with respect or relating to the Real Property or the Personal Property (collectively, the "Records").

(iii)   Assigned Contracts. All Assigned Contracts designated as assigned to GrayStreet Buyer in Schedule 3.6.

(iv)   Insurance. All insurance proceeds, whether paid directly or as damages in litigation, received by the Sellers for claims submitted in connection with damage to the Property, but only to the extent such proceeds exceed Sellers' actual disbursements paid to repair to the Real Property prior to Closing Date; provided, however, that this provision is not intended to create a present assignment of any rights under any insurance policy, but merely a covenant by Sellers to remit certain proceeds to GrayStreet Buyer if and when received; provided, further, that this provision is not intended to vest any direct right of action in GrayStreet Buyer against any insurer; provided, further, that any chapter 11 plan filed by the Sellers in the Chapter 11 Cases shall, at GrayStreet Buyer's option, (A) provide that any insurance policies that cover loss to the Property shall be conveyed, by assignment or otherwise, to GrayStreet Buyer under 11 U.S.C. § 1123(a)(5)(B); and/or (B) provide that all claims and causes of action against any insurer related to damage to the Property are retained, and GrayStreet Buyer (or its designee) shall be appointed representative of the estate under 11 U.S.C. § 1123(b)(3)(B) for purposes of pursing such claims and causes of action.

(b)   Legent Buyer Purchased Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Legent Buyer shall purchase, acquire, and accept from Sellers, on an "as is, where is" basis (except with respect to the representations and warranties made in ARTICLE III) and without any representation or warranty on the part of Sellers as to fitness, merchantability, or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to the Legent Buyer, all of Sellers' rights, title and interests in and to the following assets (the "Legent Assets"), excluding the Excluded Assets and the GrayStreet Assets, free and clear of all Liens (other than the Legent Permitted Liens) and Liabilities (other than the Assumed Liabilities), for the consideration specified in Section 2.5:

(i)   Personal Property. All of Sellers' right, title, and interest in and to all tangible personal property, including, without limitation, medical supplies, drugs, inventory, supplies, furniture and equipment and all other personal property of every kind, character and description located on, attached to, and used in connection with the Business at the Real Property (collectively, the "Personal Property"), but excluding any personal property listed as "Excluded Personal Property" on Schedule 2.1(b)(i) attached hereto and made a part hereof (collectively, the "Excluded Personal Property").

11

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

(ii)    Intangibles. All of Sellers' right, title, and interest in and to all trademarks, trade names, logos, patents, copyrights, applications for any of the aforementioned, and other similar intellectual property rights (collectively, the "Intellectual Property").

(iii)    Assigned Contracts. All Assigned Contracts designated as assigned to Legent Buyer in Schedule 3.6.

(iv)    Licenses and Permits. All of Sellers' right, title and interest in the, permits, licenses, registrations, provider numbers and approvals set forth on Exhibit G (collectively, the "Assumed Permits"), including all surveys, records, cost reports, other regulatory filings, and, to the extent included as Assigned Contracts, contracts and provider agreements related thereto, as permitted by law.

(v)    Proceeds. All proceeds derived from the Legent Assets, including collections attributable to all medical services billed under the CMS Certification Number (CCN) of VCMC after the Closing Date, even if received by the Sellers.

**Section 2.2    Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)    Cash and Cash equivalents related to the operation of the Business prior to the Closing;

(b)    all bank accounts of Sellers, safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts);

(c)    all Accounts Receivable arising from the operation of the Business prior to Closing;

(d)    neither Sellers' articles of incorporations, bylaws, and other organizational documents, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers (other than Sellers' Medicare-issued Provider Transaction Access Number (450831)), seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of either Seller as a corporation;

(e)    all equity securities of any Seller and all net operating losses of any Seller;

(f)    all Excluded Contracts;

(g)    any (1) confidential personnel and medical Records pertaining to any current employees or former employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Chapter 11 Cases that are protected by the attorney-client privilege; *provided* that Buyer shall have the right to make copies of any portions of such retained Records referenced in subsection (2) to the extent that such portions relate to the Business or any Purchased Asset;

12

(h)     all Permits other than the Assumed Permits;

(i)     any claim, right, or interest to any Tax refund or reimbursement due to Sellers or their Affiliates, except to the extent relating to any Tax period or portion of a Tax period for which Buyer is responsible for the applicable Tax under this Agreement;

(j)     subject to Section 2.1(a)(iv), all Insurance Policies (including with respect to directors and officers liability insurance) and all rights, claims and proceeds payable thereunder, except to the extent included in the Purchased Assets, including rights to discounts, credits and refunds arising from such Insurance Policies;

(k)     any other assets, properties and rights which are not Purchased Assets;

(l)     the Excluded Personal Property;

(m)     all retainers held by Debtors' professionals; and

(n)     the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3**    **Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assigned Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.6), the following obligations of Sellers, and no others, shall be assumed by GrayStreet Buyer or Legent Buyer, as indicated (the "Assumed Liabilities"):

(a)     All Liabilities arising under the Assigned Contracts assumed by the applicable Buyer that become due and payable from and after Closing (but not arising out of any breach or default thereof prior to the Closing and not with respect to any obligations thereunder that are required to be performed by Sellers on or prior to the Closing);

(b)     all Cure Costs, if any, payable by the applicable Buyer with respect to the Assigned Contracts identified by such Buyer;

(c)     all Liabilities arising from or related to the Purchased Assets purchased by the applicable Buyer from and after the Closing Date;

(d)     all Liabilities set forth in Schedule 2.5(a)(iii), which shall be assumed by the applicable Buyer as indicated on Schedule 2.5(a)(iii);

(e)     all property Taxes arising in connection with the Real Property that are due and owing after the Closing Date (all of which shall be assumed by GrayStreet Buyer);

(f)     any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Assigned Contracts assumed by such Buyer (as contemplated by Section 365 of the Bankruptcy Code); and

13

(g)     all Taxes owed to any Tax authority assessed with respect to the Purchased Assets purchased by such Buyer for any period ending after the Closing Date, including, without limitation, all Transfer Taxes.

**Section 2.4     Excluded Liabilities**.  Notwithstanding anything herein to the contrary, except for the Assumed Liabilities, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers whatsoever associated with the Purchased Assets, the Business or with respect to any other properties, rights, contracts or other assets of Sellers existing on the Closing Date (collectively, the "Excluded Liabilities"), including but not limited to any of the following Liabilities which, in each case, Sellers shall expressly retain:

(a)     all Taxes owed by Sellers to any Tax authority for any period or portion thereof ending on or prior to the Closing Date (except to the extent such Taxes are expressly provided as Assumed Liabilities pursuant to Section 2.3);

(b)     all Liabilities of Sellers related to the Excluded Assets, whether such Liabilities arise before or after the Closing Date;

(c)     all Liabilities or obligation of Sellers and their respective Affiliates under any Indebtedness, including any Indebtedness owed to any stockholder, member, Affiliate, or Subsidiary of Sellers, and any Contract evidencing any such financing arrangement unless such Contract is an Assigned Contract;

(d)     all Liabilities with respect to Seller Transaction Expenses; and

(e)     all Liabilities under the Assumed Permits arising from or related to the period of time prior to the Closing Date.

**Section 2.5     Consideration**.

(a)     In consideration of the sale of the Purchased Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

(i)     $6,250,000.00 dollars, *plus*

(ii)     the Cure Costs, if any, which shall be payable by Legent Buyer to the extent attributable to any Assigned Contracts assigned to Legent Buyer and by GrayStreet Buyer to the extent attributable to any Assigned Contracts assigned to GrayStreet Buyer; *plus*

(iii)     the assumption of the Assumed Liabilities by GrayStreet Buyer listed on Schedule 2.5(a)(iii).

(b)     Prior to the execution and delivery of this Agreement, Legent Buyer shall deliver to Sellers an amount equal to $125,000.00 (the "Deposit"), which Sellers shall hold subject to the terms of this Agreement.

14

**Section 2.6** **Assumption and Assignment of Contracts; Excluded Locations**.

(a) Assumption and Assignment of Contracts at Closing.

(i) Schedule 2.6(a)(i) attached hereto sets forth (x) each Contract to which either Seller is a party or by which either Seller is bound and that is used in or related to the Purchased Assets, (y) Cure Costs, if any, for each such Contract, and (z) a description of each such Contract (such schedule is referred to herein as the "Contract and Cure Schedule").

(ii) No later than three (3) Business Days prior to the Sale Hearing, each Buyer shall have delivered notice to Sellers (including by e-mail notice from Buyer's legal counsel to Sellers' legal counsel), which Sellers shall then file with the Bankruptcy Court, designating each Contract on the Contract and Cure Schedule as "Included" or "Excluded." Subject to Buyer's rights to modify the Contract and Cure Schedule at or before Closing, each Contract so designated as "Included" is referred to herein as an "Assigned Contract" and each Contract so designated as "Rejected" is referred to herein as an Excluded Contract. Notwithstanding the foregoing, Buyer shall have the right (in its sole and absolute discretion) to change any such designation and to notify Sellers in writing of any such change until the Closing in which case such Contract shall become an Assigned Contract or an Excluded Contract as indicated by such changed designation.

(iii) Sellers shall provide timely and proper written notice of the procedures for the assumption and assignment of Contracts to counterparties to all Contracts, in accordance with the Bidding Procedures Order, and will take all other actions necessary to cause all Assigned Contracts to be assumed by Sellers (to the extent not already assumed pursuant to a Final Order of the Bankruptcy Court) and assigned to Buyer. Buyer shall, at or prior to Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign to Buyer the Assigned Contracts.

(iv) Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract, in accordance with the Bidding Procedures Order, and shall use commercially reasonable efforts to correctly calculate the proper Cure Costs, if any, for each Assigned Contract. To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Cure Costs related to such Assigned Contract, or any portion thereof, shall be paid by Legent Buyer to the extent of any Assigned Contracts assigned to Legent Buyer, and by GrayStreet Buyer to the extent of any Assigned Contracts assigned to GrayStreet Buyer, on such date that the Assigned Contract is assumed by the applicable Seller and assigned to Legent Buyer or GrayStreet Buyer, as applicable, or on such other date as agreed to between the applicable Buyer and the counterparty to such Assigned Contract.

(v) At Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents requested by Legent Buyer or GrayStreet Buyer, as applicable, assign to the applicable Buyer (the consideration for which is included in the Purchase Price), and the applicable Buyer shall assume from Sellers (to the extent not already assumed pursuant to a Final Order of the Bankruptcy Court), each of the Assigned Contracts.

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

(b)      Assigned Contracts.  Unless otherwise agreed by Sellers and Buyer, the Sale Order shall provide that all Excluded Contracts as of the Closing are deemed rejected by the Debtors pursuant to Section 365 of the Bankruptcy Code as of the Closing Date. Upon Closing, or on such other date that any applicable Contract is assumed and assigned to Buyer pursuant to this Section 2.6, such Contract shall constitute an Assigned Contract for all purposes under this Agreement; provided, that no Assigned Contract shall be assigned or transferred pursuant to this Agreement unless the Bankruptcy Court has approved the assumption and assignment thereof to Buyer.

Section 2.7   Closing.  The closing of the Contemplated Transactions (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages on the first Business Day on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in ARTICLE VII shall have been satisfied or waived (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) (the "Closing Date"), subject to extension by agreement of Buyer and Seller (such agreement not to be unreasonably withheld) to effect the transaction contemplated herein.

Section 2.8   Deliveries at Closing.

(a)      At the Closing, Sellers shall deliver to Buyer and/or its designees the following documents and other items, duly executed by Sellers, as applicable:

(i)      one or more Bills of Sale substantially in the form of Exhibit A1 and Exhibit A2, as applicable, each attached hereto (each, a "Bill of Sale");

(ii)     one or more Assignment and Assumption Agreements, including an Assignment, Bill of Sale and Assumption of Licenses Agreement transferring the Assumed Permits from Sellers to Buyer, substantially in the form of Exhibit B1 and Exhibit B2, as applicable, each attached hereto (each, an "Assignment and Assumption Agreement");

(iii)    instruments of assignment substantially in the forms of Exhibit C, and Exhibit D attached hereto for the transfer of Seller's trademarks and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "Intellectual Property Assignments");

(iv)     The deed, in the form and substance of Exhibit F attached hereto and made a part hereof, fully executed and acknowledged by Seller, conveying to Buyer title to the Real Property, subject to any municipal or other governmental zoning laws, regulations and ordinances, if any, affecting the Real Property and the GrayStreet Permitted Liens.

(v)      a transition services agreement between VCMC and Legent Buyer, in form and substance satisfactory to Legent Buyer, pursuant to which (A) Legent Buyer is granted the right to bill under the Medicare number of VCMC following the Closing, (B) VCMC agrees to transmit to Legent Buyer all related collections for services billed under the Medicare of VCMC following the Closing, and (C) VCMC will obtain tail insurance in customary amounts for the professional liability policy of VCMC at the end of the transition period;

16

(vi)     Evidence reasonably satisfactory to the Title Company that the Sellers are validly existing and in good standing in their States of formation and authorized to transact business in the State in which the Real Property is located, that the person executing the closing documents on behalf of the Sellers has full right, power, and authority to do so.

(vii)     Evidence reasonably satisfactory to the Legent Buyer that the Sellers' Texas hospital license (with continuing physician ownership compliance) and Medicare-issued Provider Transaction Access Number (450831) are active and in good standing (including that the Sellers have updated the Medicare enrollment record of VCMC to indicate that the Hospital is a physician-owned hospital and to disclose all 5% or more direct and indirect owners and such update has been accepted by CMS), together with a written confirmation that Sellers have not received any notices from any Governmental Authorities alleging any deficiency, revocation, suspension or relinquishment of such Texas license and Medicare number, except for those deficiencies cited in the survey conducted by Texas Health and Human Services Commission ("Texas HHS") on February 19, 2026 (the "Texas HHS Survey").

(viii)     Evidence reasonably satisfactory to the Legent Buyer that, in connection with the Texas HHS Survey, Sellers have submitted to Texas HHS on or before March 23, 2026 a plan of correction (the "Plan of Correction") addressing all deficiencies cited in the Texas HHS Survey (provided that Legent Buyer shall have the opportunity to review and approve the Plan of Correction prior to submission to Texas HSS).

(ix)     Evidence that a claim has been submitted to Medicare (not including a Medicare Advantage plan) within the sixty (60) day period prior to the Closing Date.

(x)     Evidence that all regulatory filings set forth on Schedule 3.3, including each of the CMS-855A change of ownership applications, have been submitted to the applicable regulatory authorities, in each case in form and substance satisfactory to Buyer.

(xi)     A non-foreign status affidavit in the form of Exhibit I attached hereto and made a part hereof, fully executed and acknowledged by each Seller, providing each Sellers' U.S. taxpayer identification number and stating that each Seller is not a "foreign person" as defined in 26 U.S.C. Section 1445.

(xii)     The Title Affidavit in a form and substance as is customarily required by the Title Company in similar transactions, fully executed and acknowledged by Seller, and such resolutions and certificates as the Title Company shall require to evidence the due authorization of the execution and performance of this Agreement and the documents to be delivered pursuant hereto; and all other customary affidavits and indemnities required by the Title Company to permit the Title Company to issue to Buyer the Owner's Policy of Title Insurance.

(xiii)     All real estate tax bills as issued for the Real Property for 2025/2026.

(xiv)     All original (or confirmed copies of) the Leases and all Contracts together with all warranties, guarantees, and other similar documents being assigned to Buyer.

(xv)     All certificates of occupancy and other governmental permits, certificates and approvals for the Property.

17

(xvi)   Such information as the Escrow Agent may reasonably require in order to prepare a closing statement showing the Purchase Price, the Earnest Money Deposit plus accrued interest, and any adjustments thereto (collectively, the "Settlement Statement"), together with a counterpart duly executed by Seller. Seller shall deliver or cause to be delivered to Buyer a draft of the Settlement Statement at least five (5) days prior to the Closing.

(xvii)   Any other documents or deliveries as may be reasonably required by the Title Agent and/or the Escrow Agent or as may be agreed upon in writing by the Parties to consummate the Transaction contemplated hereby.

(xviii)  a completed and duly executed IRS Form W-9 from each Seller;

(xix)   physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery; and

(xx)   all other documents, instruments, and writings reasonably requested by Buyer to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

(b)   At the Closing, Buyer shall deliver to, or for the benefit of, Sellers the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)   the Purchase Price, less the Deposit, by credit bid from the DIP Lender in an amount to be determined by GrayStreet Buyer and the DIP Lender in their sole and absolute discretion, and the balance by wire transfer of immediately available funds to an account designated in writing by Seller to Buyer;

(ii)   the Bill(s) of Sale;

(iii)   the Assignment and Assumption Agreement(s);

(iv)   the Intellectual Property Assignments;

(v)   the IP Lease Assignments, if any;

(vi)   A counterpart of the Settlement Statement;

(vii)   Cure Costs, if any, by wire transfer of immediately available funds to the accounts designated by the applicable counterparties to the applicable Assigned Contracts; and

(viii)   all other documents, instruments and writings reasonably requested by Sellers to be delivered by Buyer at or prior to the Closing pursuant to this Agreement.

(c)   At the Closing, GrayStreet Buyer shall deliver to Legent Buyer a real property lease for the VCMC Hospital premises, executed by Legent Buyer and GrayStreet Buyer, for a term of six (6) months and a nominal rent amount, in form and substance satisfactory to Legent Buyer in its reasonable discretion.

18

**Section 2.9**     **Allocation**.   Seller and Buyer agree that the Purchase Price and the Assumed Liabilities (plus other relevant items) shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) in accordance with Section 1060 of the Code as shown on the allocation schedule attached hereto (the "**Allocation Schedule**") as Exhibit J. Seller and Buyer each agree to prepare and file an IRS Form 8594 on the Closing Date and consistent with the allocation determined pursuant to the Allocation Schedule.

## ARTICLE III.
## SELLERS' REPRESENTATIONS AND WARRANTIES

Each Seller, jointly and severally, represents and warrants to Buyer that, except as set forth in the correspondingly numbered section and subsection of the disclosure schedules accompanying this Agreement (the "Disclosure Schedules"), the statements in this ARTICLE III are true and correct as of the date hereof:

**Section 3.1**     **Organization of Sellers; Good Standing**.

(a)     Each Seller is duly formed, validly existing and in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease, and operate the Real Property and to conduct its Business in the manner in which it is currently being conducted. Each Seller has all requisite corporate power and authority to own, lease, and operate the Purchased Assets and to carry on the Business in the Ordinary Course of Business.

(b)     Each Seller is duly authorized to conduct their Business and is in good standing as a foreign entity in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.2**     **Authorization of Transaction**.   Subject to the Sale Order having been entered and being a Final Order at the time of Closing:

(a)     each Seller has all requisite power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller and no other action on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)     this Agreement has been duly and validly executed and delivered by each Seller, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which each Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming this Agreement constitutes a valid and legally binding obligation of Buyer, this Agreement constitutes the valid and legally binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that a Seller is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer,

19

each Related Agreement to which either Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against each such Seller, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3      Non-contravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and being a Final Order at the time of Closing, (a) conflict with or result in a breach of the certificate of formation, articles of organization, operating agreement, company agreement, or other organizational documents of either Seller, (b) violate any Law to which either Seller is, or its respective assets or properties are, subject, or (c) subject to the entry of the Sale Order, to Sellers' Knowledge, conflict with, any Assigned Contract, and, in the case of clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.  No Seller is required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions, except as set forth on Schedule 3.3.

**Section 3.4      Compliance with Laws**.  Sellers are, and have been for the six (6) year period prior to the Effective Date, in compliance in all material respects with all material Laws applicable to the Purchased Assets, except as disclosed on Schedule 3.4.

**Section 3.5      Title to Purchased Assets**.  Sellers, as of the Closing, will have good and marketable title to, or, in the case of leased assets, will have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for GrayStreet Permitted Liens and Legent Permitted Liens, respectively) and Liabilities (other than Assumed Liabilities), subject to entry of the Sale Order. At the Closing, in accordance with the Deed, Sellers will transfer, sell, assign and convey, subject to the Sale Order having been entered and still being a Final Order at such time, good and marketable title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.

**Section 3.6      Contracts**.  Schedule 3.6 of the Disclosure Schedules attached hereto includes each Assigned Contract. Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Except as otherwise implicated or stated herein, Seller is not, and to Sellers' Knowledge, no other party thereto, is in breach of or default under or is alleged to be in breach of or default under, or has provided or received any notice of any intention to terminate, any Assigned Contract. Complete and correct copies of each Assigned Contract have been made available to Buyer.

**Section 3.7      Intellectual Property**.  Schedule 3.7 of the Disclosure Schedules sets forth a true and complete list of (i) all material items of Intellectual Property that are owned by each Seller, (ii) all material Contracts pursuant to which each Seller obtains the right to use any Intellectual Property, excluding licenses for off-the-shelf software, and (iii) all material Contracts pursuant to which each Seller grants to any other Person the right to use any Intellectual Property.

20

To Sellers' Knowledge, Sellers own or have a valid right to use all such Intellectual Property necessary for the Purchased Assets, and all such Intellectual Property is valid, subsisting, and, to Sellers' Knowledge, enforceable, and is not subject to any outstanding Order adversely affecting Sellers' use thereof or rights thereto.

**Section 3.8** **Litigation**.  Schedule 3.8 of the Disclosure Schedule sets forth all material Litigation brought by or against the Business, the Purchased Assets, or any Seller during the last six (6) years.

**Section 3.9** **Healthcare Matters.**

(a) Permits.  Schedule 3.9 of the Disclosure Schedule contains a list of all material permits that Sellers hold as of the Effective Date in connection with the operation of the Business. Sellers are in material compliance with, and during the past six (6) years have complied with, all permits.  Each such permit is in good standing without any survey deficiencies and such permits constitute all permits that are required for Seller to conduct the Business as currently conducted.  All fees and charges with respect to such permits that are due and payable as of or prior to the date hereof have been paid in full. No suspension or cancellation of any permit is or has been threatened and there is no basis for believing that: (x) any material permit will not be renewable upon expiration or (y) there has been any event that has occurred that would reasonably be expected to result in the termination, revocation, cancellation, non-renewal or adverse modification of any material permit.   Complete and accurate copies of all such issued permits have been delivered to Buyer.

(b) Federal Health Care Programs.  The Business is qualified for participation in, and has current and valid provider contracts with the Medicare program and is in material compliance with the conditions of participation or requirements applicable with respect to such participation.   The Business is entitled to receive, and is receiving payment under, the Medicare Program for services rendered to qualified beneficiaries and is not subject to any withholds, offsets, recoupments, payment plans or settlement amounts in respect thereof.

(c) Government Touches.  No Seller: (i) is a party to a Corporate Integrity Agreement with the Office of Inspector General or a Deferred Prosecution Agreement with the United States Department of Justice, (ii) has any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority or other entity, (iii) has been the subject of any investigation conducted by any federal, state, or local enforcement agency, (iv) has been a defendant in any qui tam/False Claims Act litigation, (v) has been served with or received any search warrant, subpoena, civil investigative demand, or other written correspondence by or from any Governmental Authority, including any federal, state, or local enforcement agency, regarding any actual or alleged violation of any health care Laws.

(d) Privacy.  The Business has and has had in place plans, policies, and/or procedures, including written manuals and executed business associate agreements designed to comply with HIPAA in all material respects.  Neither the Business nor its systems has been the subject of a successful "security incident" (as defined under the Security Rule), any breach of the Standards for Privacy of Individually Identifiable Health Information (as defined under HIPAA) or any other violation of HIPAA.

21

(e)  Billing.  All billing practices of the Business have been in material compliance with all applicable Laws and payor requirements, and the Business has not billed for or received any payment or reimbursement in excess of amounts permitted by applicable Law. During the last six (6) years, the Business has not received any written notice of denial of payment, recoupment, offset, withhold, suspension or overpayment from Medicare, Medicaid or private payor program exceeding $10,000 with respect to services provided at the Business.  The Business takes commercially reasonable steps to collect all copayments, deductibles and other patient financial responsibilities in compliance with applicable law. The Business has not been the subject of any focused reviews, Recovery Audit Contractor audits, Medicaid Integrity Program audits, Zone Program Integrity Contractor audits,  or other audits with respect to any Federal Health Care Program. There is no pending or, to Sellers' Knowledge, threatened audit or investigation by any third party payor with respect to the Business's billing practices, other than routine review and discussion regarding reimbursement claims.  The Business does not maintain any credit balances from patients or private payors.

(f)  Fraud and Abuse.  To Sellers' Knowledge, no employee, owner or agent of the Business, has directly or indirectly (i) made any contribution or gift which contribution or gift is in violation of any applicable Law, (ii) made any bribe, rebate, payoff, influence payment, kickback or other payment to any Person, private or public, regardless of form, whether in money, property or services in violation of any Law, (A) to obtain favorable treatment in securing business, (B) to pay for favorable treatment for business secured, (C) to obtain special concessions or for special concessions already obtained for or in respect of the Business or any Affiliate thereof, (iii) established or maintained any fund or asset of the Business that has not been recorded in the books and records of the Business or (iv) established, operated or maintained any program, scheme, practice, policy or system that would reward or compensate employees or contractors for marketing or promotion activities, in each case that violates any Law.

**Section 3.10   Physician-Owned Hospital.**

(a)  Physician Ownership and Provider Agreement.  The Hospital operated by Sellers was owned by physicians (or immediate family members of such physicians) and enrolled with the Medicare program as of July 7, 2010.

(b)  Prohibition on Facility Expansion.  Schedule 3.10(b) of the Disclosure Schedule sets forth: (i) the number of operating rooms, procedure rooms, and beds for which the Business was licensed as of July 7, 2010.  Since July 7, 2010, the Business has not increased the number of operating rooms, procedure rooms, and beds beyond that for which the Hospital was licensed on the ACA Date.

(c)  Disclosure Requirements.  Since the Lookback Date, the Business has submitted an annual report to CMS containing a detailed description of the identity of each direct and indirect owner in the Business.  Since the Lookback Date, the Business has required each referring physician owner who is a member of its medical staff to agree, as a condition of continued medical staff membership or admitting privileges, to provide written disclosure of his or her ownership or investment interest in the Business (and, if applicable, the ownership or investment interest of any treating physician) to all patients whom the physician refers to the Business. Each physician owner of the Business has provided written disclosure of his ownership interest in the

22

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

Business to all patients in advance of treatment. The Business has not conditioned any physician ownership or investment interests either directly or indirectly on the physician owner or investor making or influencing referrals to the Business or otherwise generating business for the Business. Since the Lookback Date, the Business has disclosed on its public website and public advertising that the Business is owned by physicians.

(d)     Bona Fide Investment. Schedule 3.10(d) sets forth the percentage of the total value of the ownership or investment interests held, directly and indirectly, in the Business by physician owners or investors (or as such term is defined in 42 U.S.C. § 1395m(i)(5)) in the aggregate as of March 23, 2010. The percentage of the total value of the ownership or investment interests held in the Business by physician owners or investors in the aggregate has not, at any time following March 23, 2010, exceeded such percentage as of March 23, 2010. The Business has not offered ownership interests to a physician on terms more favorable than those offered to non-physicians. The Business has not provided any loans or financing to physician investors or otherwise directly or indirectly guaranteed a loan, made any loan payments or subsidized a loan for any physician that is related to acquiring an ownership interest in the Business. The Business distributes all investment returns in an amount that is proportional to ownership interests. The Business has not, directly or indirectly, offered physician owners a guaranteed right to purchase business interests related to the Business. The Business has not offered a physician owner or investor the opportunity to purchase or lease any property under the control of the Business or any other owner or investor in the Business on more favorable terms than the terms offered to an individual who is not a physician owner or investor. Since the Lookback Date, the Business has structured its equity offerings to physician investors such that the purchase prices are consistent with fair market value, and each physician investor is offered an equal amount of equity interests. Since the Lookback Date, the Business has not issued and sold additional equity to existing equity holders.

(e)     Patient Safety. The Business has a physician available on the premises to provide services during all hours in which the Business is providing services to the patient. The Business has the capacity to provide assessment and initial treatment for all patients, and the ability to refer and transfer patients to hospitals with the capability to treat the needs of the patient that the Business is unable to address. The Business has not been converted from an ambulatory surgery center to a hospital.

(f)     Physician Investors. Each of the physician owners of the Business is board certified in their medical specialty and maintains active medical staff privileges at the Hospital which authorize such physician to perform professional services at the Business. The Business has not entered into any compensation arrangements or any other written agreements with referral sources or referral recipients, except as set forth on the Disclosure Schedules hereto, all of which are structured in compliance with law.

(g)     Provider Based Locations. The main campus of the Hospital is located at 4301 Vista Road, Pasadena, TX 77504. The Hospital does not operate any other locations.

**Section 3.11   RESERVED**.

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**Section 3.12    Taxes**.

(a)    Sellers have timely filed all tax returns that they were required to file and have timely paid in full all Taxes that they were required to pay as reflected on such tax returns.

(b)    There are no Encumbrances for Taxes on any of the Purchased Assets.

(c)    Sellers have not granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Taxes.

(d)    There is no action, suit, proceeding, investigation, audit, claim, assessment or judgment now pending against any Seller or relating to the Purchased Assets in respect of any Taxes.

(e)    No Seller is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section 3.13    Brokers' Fees**.  Except with respect to Gordian Group, LLC (whose fees or commissions will be borne by Sellers), Sellers' investment banker, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated to pay.

**Section 3.14    No Other Representations or Warranties**.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULES), NEITHER SELLERS NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE CONTEMPLATED TRANSACTIONS, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULES), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, THE ABSENCE OF LATENT DEFECTS OR COMPLIANCE WITH LAWS AND REGULATIONS, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION,

24

INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF EITHER SELLER OR ANY OF THEIR AFFILIATES).

FURTHER, BUYER ACKNOWLEDGES THAT IT IS A SOPHISTICATED PARTY EXPERIENCED IN THE PURCHASE AND SALE OF REAL ESTATE. EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE III, THE PROPERTY WILL BE CONVEYED AND TRANSFERRED TO BUYER "AS IS, WHERE IS AND WITH ALL FAULTS." BUYER ACKNOWLEDGES THAT BUYER HAS EXAMINED, REVIEWED, AND INSPECTED ALL MATTERS WHICH IN BUYER'S JUDGMENT BEARS UPON THE PROPERTY AND THEIR VALUE AND SUITABILITY FOR BUYER'S PURPOSES AND, EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS ARTICLE III, BUYER IS RELYING SOLELY ON ITS OWN EXAMINATION, REVIEW, AND INSPECTION OF THE PROPERTY.

THE PROVISIONS OF THIS SECTION 3.13 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS, INCLUDING THE DEED, TO BE DELIVERED AT CLOSING.

## ARTICLE IV.
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1     Organization of Buyer**.  GrayStreet Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.  Legent Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Texas and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2     Authorization of Transaction**.

(a)     Buyer has full limited liability company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b)     The execution, delivery, and performance of this Agreement and the Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c)     This Agreement has been duly and validly executed and delivered by Buyer, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally-binding

25

obligation of Sellers, this Agreement constitutes a valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3** **Non-contravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements) will (a) conflict with or result in a breach of the certificate of formation or other organizational documents of Buyer, (b) violate any Law to which Buyer is, or its assets or properties are subject, or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, delay, or impair to the ability of Buyer to consummate the Contemplated Transactions.

**Section 4.4** **Financial Capacity**.

(a) As of the Closing, Buyer (a) will have the resources (including sufficient funds available to pay the Cure Costs, if any, and any other expenses and payments incurred by Buyer in connection with the Contemplated Transactions) and capabilities (financial or otherwise) to perform its obligations hereunder, including the payment of the Purchase Price and all other fees, costs, or expenses to be paid by Buyer that are necessary to consummate the Contemplated Transactions, this Agreement, Related Agreements, and assume the Assumed Liabilities, and (b) will not have incurred any obligation, commitment, restriction, or Liability of any kind, that would materially impair or materially adversely affect such resources and capabilities. Buyer's ability to consummate the Contemplated Transactions is not contingent upon its ability to secure financing or to complete any public or private placement of securities prior to or upon Closing.

(b) Immediately after giving effect to the Contemplated Transactions, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or any Seller. In connection with the Contemplated Transactions, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 4.5** **Litigation**. There is no Litigation pending, or to the Buyer's Knowledge, threatened, that would affect Buyer's ability to perform its obligations under this Agreement, or any other Related Agreement, or to consummate the Contemplated Transactions.

26

**Section 4.6** **Adequate Assurances Regarding Executory Contracts**.  Buyer will use commercially reasonable efforts to assure that, as of the Closing, it will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

**Section 4.7** **Good Faith Purchaser**.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets. Buyer has negotiated and entered into this Agreement in good faith.

**Section 4.8** **Brokers' Fees**.  Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which either Seller could become liable or obligated to pay.

**Section 4.9** **Condition of Business**.  **BUYER HAS ENTERED INTO THIS AGREEMENT WITH THE INTENTION OF MAKING AND RELYING UPON ITS OWN INVESTIGATION OF THE PHYSICAL, ENVIRONMENTAL, ECONOMIC, AND LEGAL CONDITION OF THE ASSETS OF THE BUSINESS AND THAT BUYER IS NOT RELYING UPON ANY STATEMENTS, INFORMATION, REPORTS, REPRESENTATIONS, OR WARRANTIES OTHER THAN THOSE SPECIFICALLY SET FORTH IN ARTICLE 5 OF THIS AGREEMENT OR IN ANY CONVEYANCE DOCUMENTS EXECUTED AND DELIVERED BY SELLERS, MADE BY SELLERS, OR ANYONE ACTING OR CLAIMING TO ACT ON SELLERS' BEHALF CONCERNING THE ASSETS OF THE BUSINESS, INCLUDING EMPLOYEES OR CONTAINED IN ANY COPIES OF MANAGEMENT PERSONNEL DATA PROVIDED TO BUYER WITH RESPECT TO EMPLOYEES.  BUYER FURTHER ACKNOWLEDGES THAT IT HAS NOT RECEIVED FROM SELLERS ANY ACCOUNTING, TAX, LEGAL, ARCHITECTURAL, ENGINEERING, PROPERTY MANAGEMENT, OR OTHER ADVICE WITH RESPECT TO THIS TRANSACTION AND IS RELYING SOLELY UPON THE ADVICE OF ITS OWN ACCOUNTING, TAX, LEGAL, ARCHITECTURAL, ENGINEERING, PROPERTY MANAGEMENT, AND OTHER ADVISORS.  BUYER WILL PURCHASE THE ASSETS OF THE BUSINESS IN THEIR "AS IS", "WHERE-IS" AND "WITH-ALL FAULTS" CONDITION ON THE CLOSING DATE WITHOUT ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED (INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE), EXCEPT FOR THE PROVISIONS OF ARTICLE 5 OF THIS AGREEMENT AND ANY CONVEYANCE DOCUMENT EXECUTED AND DELIVERED BY SELLERS, AND ASSUMES THE RISK THAT ADVERSE PHYSICAL, ENVIRONMENTAL, ECONOMIC, OR LEGAL CONDITIONS MAY NOT HAVE BEEN REVEALED BY ITS INVESTIGATION.**

**ARTICLE V.**
**PRE-CLOSING COVENANTS**

The Parties agree as follows with respect to the period between the Effective Date and the Closing Date (except as otherwise expressly stated to apply to a different period):

27

**Section 5.1     Certain Efforts; Cooperation**.

(a)     Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to a Final Order of the Bankruptcy Court, to make effective the Contemplated Transactions (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in ARTICLE VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Chapter 11 Cases.

(b)     On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than GrayStreet Permitted Liens and Legent Permitted Liens, respectively) and Liabilities (other than Assumed Liabilities) expressly contemplated by the Sale Order. Buyer shall at all times take all appropriate actions necessary to permit, and shall refrain from taking any action that would prevent, the Bankruptcy Court to make findings in the Sale Order that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) that the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code, and (iii) Buyer is not a successor to Sellers with respect to the Purchased Assets.

**Section 5.2     Notices and Consents**.

(a)     To the extent required by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and Sellers' obligations hereunder shall only continue until the later of the day that the Chapter 11 Cases are converted, closed or dismissed.

(b)     Sellers and Buyer shall cooperate with one another in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers, including the regulatory filings set forth on Exhibit H; provided, however, that Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and Sellers' obligations hereunder shall only continue until the later of the day that the Chapter 11 Cases are converted, closed or dismissed.

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

(c)        Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Authority in respect of any application, filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Subsidiaries and/or Affiliates, as the case may be, that appears in any application or filing made with, or written materials submitted to, any third party and/or any Governmental Authority in connection with the Agreement and the Contemplated Transactions and incorporate the other Party's reasonable comments, (iii) not participate in any substantive meeting or discussion with any Governmental Authority in respect of any filing, investigation, or inquiry concerning this Agreement and the Contemplated Transactions unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to participate in and/or attend such meeting and/or discussion, and (iv) furnish the other Party with copies of all correspondences, filings, and written communications between them and their Subsidiaries and/or Affiliates and Representatives, on the one hand, and any Governmental Authority or its respective staff, on the other hand, with respect to this Agreement and the Contemplated Transactions; provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (A) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (B) to remove references concerning financing arrangements, (C) as necessary to comply with contractual arrangements, and (D) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anticompetitive grounds.

Section 5.3      **Bankruptcy Actions**.

(a)        Bid Protections. If this Agreement is not accepted by Sellers as the Winning Bid in accordance with the Bidding Procedures, then GrayStreet Buyer shall be entitled to an amount equal to $187,500.00 (the "Breakup Fee"), and GrayStreet Buyer's reasonable, documented out-of-pocket fees, costs and expenses (the "Expense Reimbursement") actually incurred, owed or paid to third parties in an aggregate amount not to exceed $150,000.00 (such amount shall be inclusive of attorneys' fees and expenses, consulting fees and expenses, accounting fees and expenses and Buyer's out-of-pocket expenses) in the preparation of a bid for the Business, the Purchased Assets and the Assumed Liabilities, the negotiations and execution of this Agreement and the other Related Agreements, and efforts related to consummation of the Contemplated Transactions (collectively, the "Bid Protections").

(b)        Alternate Transactions. From and after the Effective Date, Sellers and their respective Affiliates and Representatives shall be permitted to market and solicit inquiries, proposals, offers or Qualified Bids from, any Person other than Buyer regarding an Alternate

29

Transaction, and may take any other affirmative action in connection therewith (including (i) entering into any Alternate Agreement (or letter-of-intent with respect thereto), (ii) issuing press releases, placing advertisements or making other releases or disclosures in connection therewith, or (iii) seeking approval of the Bankruptcy Court for any Alternate Transaction), and nothing in this Agreement will, or is intended to, in any way be deemed to restrict such actions or efforts. None of Sellers nor any of their respective Affiliates or Representatives shall have any Liability to Buyer or any of its Affiliates or Representatives, either under or relating to this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of such an Alternate Agreement (or letter-of-intent with respect thereto) provided that Buyer is paid the Bid Protections to the extent required to be paid pursuant to Section 5.3(a) and the Bidding Procedures Order at the time provided for therein.

(c)  Auction. The Auction, if necessary, shall take place at the date and time established by the Bidding Procedures Order. At the conclusion of the Auction, and in accordance with the Bidding Procedures, Sellers will determine the Winning Bid submitted by a Qualified Bidder (as defined in the Bidding Procedures) and the next highest or best Qualified Bid (the "Back-Up Bid") submitted by a Qualified Bidder (the "Back-Up Bidder"). Sellers will seek approval of the Winning Bid at the Sale Hearing. If for any reason, Buyer is selected as the Back-Up Bidder, and the Qualified Bidder submitting the Winning Bid fails to timely consummate the purchase of the Purchased Assets, Sellers may seek to consummate a sale to Buyer pursuant to this Agreement without further approval by the Bankruptcy Court. If Buyer is selected as the Back-Up Bidder, its Back-Up Bid and the obligation of Buyer to consummate the Contemplated Transactions shall remain open and in full force until the close of a sale of the Purchased Assets to the Winning Bidder.

(d)  Sale Order. Seller shall use commercially reasonable efforts to cause the Sale Order to be entered by the Bankruptcy Court no later than the Sale Order Deadline.  The Sale Order shall be in a form acceptable to Buyer in its reasonable discretion and provide, among other things, that:

(i)  this Agreement is valid and enforceable;

(ii)  this Agreement and the Contemplated Transactions are approved;

(iii)  on the Closing Date, the Purchased Assets shall be sold to Buyer free and clear of any and all Liens (except for GrayStreet Permitted Liens and Legent Permitted Liens, respectively), including any Liens granted during the Chapter 11 Cases, and Liabilities (other than Assumed Liabilities);

(iv)  on the Closing Date, the Assigned Contracts shall be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and, unless a counterparty to an Assigned Contract has agreed otherwise in writing, the Buyer shall pay the Cure Costs due in connection with the assumption and assignment of the Assigned Contracts;

(v)  all causes of actions against any counterparty to the Assigned Contracts, related in any way to the Assigned Contracts, shall be forever released and waived by

30

Sellers; provided, however, that Sellers shall be entitled to assert any defenses against any claim asserted by any counterparty to the Assigned Contracts; and

(vi) all Persons and entities, including, Tax, regulatory and other Governmental Authorities, lenders, trade and other creditors holding interests or claims of any kind or nature whatsoever against Sellers or their assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with or in any way relating to Sellers, the Business, the Purchased Assets, or the operations of Sellers prior to the Closing shall have no claims against Buyer, its Affiliates, or their respective successors or assigns, the Business, or the Purchased Assets, subject to rights of such Persons and entities for claims arising out of Assumed Liabilities.

(e) <u>Sale Order Findings</u>. The Sale Order shall contain findings by the Bankruptcy Court that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) Buyer is not a successor to Sellers, (iii) Sellers' Texas hospital license (with continuing physician ownership compliance) and Medicare-issued Provider Transaction Access Number (450831) are active, in full force and effect, and transferrable to Buyer, and (iv) the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code.

(f) <u>Cooperation</u>. Sellers and Buyer agree to use commercially reasonable efforts to cooperate, assist and consult with each other to obtain the issuance and entry of the Bidding Procedures Order and Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court; <u>provided</u>, <u>however</u>, that the Sale Order is in a form acceptable to the Buyer in its reasonable discretion. The Sale Order shall also indicate that the transactions set forth in this Agreement may be consummated immediately upon entry of the Sale Order and pursuant to Bankruptcy Rule 6004(h), the sale of the Purchased Assets is not stayed pending the expiration of fourteen (14) days from the date of entry of the Sale Order. In the event the Sale Order is appealed, Sellers shall use their commercially reasonable efforts to oppose any such appeal.

**Section 5.4    Conduct of Business**.  From the Effective Date until the earlier of the termination of this Agreement pursuant to <u>Section 8.1</u> or the Closing Date, except (a) as disclosed on <u>Schedule 5.4</u>, (b) as may be required by the Bankruptcy Court, (c) for the consequences resulting from the continuation of the Chapter 11 Cases, or (d) as may be required or contemplated by this Agreement, subject to the terms of the Final DIP Order, each Seller shall maintain the Business and the Purchased Assets in the Ordinary Course of Business and use its commercially reasonable efforts to preserve intact the Purchased Assets (and all goodwill relating thereto) and all respective relationships with customers, vendors, creditors, employees, agents, each Governmental Authority, and others having business relationships with them. Without limiting the generality of the foregoing, during the period from the Effective Date of this Agreement to the Closing, except as otherwise contemplated by this Agreement or as Buyer shall otherwise consent in writing, each Seller shall do the following:

31

(a)      Subject to necessary approval by the Bankruptcy Court, if applicable, pay all post-petition bills and invoices for post-petition goods or services when due, including rent, Taxes and other amounts due that may become part of the Purchased Assets;

(b)      notify Buyer of any Material Adverse Effect (financial or otherwise), in its Business condition, properties, assets or Liabilities, or of the commencement of or any material development or disposition with respect to any material governmental complaints, investigations, or hearings (or any written threats thereof);

(c)      in the Ordinary Course of Business, maintain all of the material equipment on the Real Property and the material maintenance of the Real Property;

(d)      use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits necessary or required by Law to own, lease and operate the Purchased Assets and to carry on the Business, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date

(e)      use its commercially reasonable efforts to maintain and preserve the validity and active status of Sellers' Texas hospital license (with continuing physician ownership compliance) and Medicare-issued Provider Transaction Access Number (450831); and

(f)      maintain insurance coverage, including professional liability insurance, with financially responsible insurance companies duly licensed in the states in which Sellers are then operating, substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Effective Date.

**Section 5.5      Certain Restricted Conduct**.    Except as in the Ordinary Course of Business, as directed by the Bankruptcy Court, or as otherwise consented to in advance in writing by Buyer, during the period from the Effective Date to the Closing, no Seller shall, and each Seller shall cause each of its respective Affiliates not to, with respect to the Purchased Assets:

(a)      sell, lease, license, transfer, or dispose of any Purchased Assets;

(b)      dispose of or permit to lapse any rights in, to or for the use of any permit or any material Intellectual Property;

(c)      take any action which, if taken, or omit to take any act which, if omitted to be taken, would constitute or result in an "Event of Default" under the Final DIP Order;

(d)      permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien, except for GrayStreet Permitted Liens and Legent Permitted Liens, respectively;

(e)      directly or indirectly, cancel, forgive, settle, or compromise any debt or claim or waive or release any right of Sellers that constitute a Purchased Asset;

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

(f)      do any other act that would, to Sellers' Knowledge, cause any representation or warranty of either Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect; or

(g)      authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

**Section 5.6      Notice of Developments**.  From the Effective Date until the Closing Date, each of Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.6 shall not limit or otherwise affect the remedies available to the Party receiving such notice under this Agreement if such Party objects to the disclosures contained in such notice within five (5) calendar days of receipt of such notice.

**Section 5.7      Contracts**.  If at any time Sellers become aware, on or before the Closing, of any heretofore Assigned Contract to which either Seller is a party that satisfies the conditions of Section 3.6, but has not been included on Schedule 3.6 of the Disclosure Schedule, Sellers shall promptly thereafter advise Buyer of the existence of such Contract and provide Buyer with a copy thereof. Buyer shall have the right, for a period of five (5) Business Days following the delivery of any such Contract, to review such Contract and during such period Sellers shall refrain from modifying, terminating, or rejecting such Contract without Buyer's express prior written consent unless otherwise directed by the Bankruptcy Court. Buyer shall have the option, exercisable by written notice to Sellers given within such five (5) Business Day period, to request that Sellers assume (if applicable), assign and sell such Contract to Buyer. If Buyer timely exercises such option and subject to compliance with Section 365 of the Bankruptcy Code, Sellers shall use commercially reasonable efforts to assume (if applicable), assign, and sell such Contract to Buyer, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Assigned Contracts; provided, however, that Buyer shall be responsible for the payment of any Cure Cost in connection with the assumption and assignment of such Assigned Contract (if applicable), except as otherwise provided in Section 2.6 and provided such Cure Cost is an Assumed Liability. If Buyer fails to timely exercise its option or declines to exercise such option, Sellers shall reject such Contract upon five (5) Business Days' notice to Buyer.

**ARTICLE VI.**
**OTHER COVENANTS**

The Parties agree as follows with respect to the period from and after the Closing; provided that Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are converted, closed or dismissed:

33

**Section 6.1    Cooperation**.  Each of the Parties shall cooperate with the other Parties, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2    Post-Closing Cooperation Regarding Regulatory Approvals**.  With respect to the regulatory filings set forth on <u>Exhibit H</u>, Sellers and Buyer shall cooperate with one another in responding to inquiries, deficiencies, and additional questions from Governmental Authorities with respect to such filings, until such time as the Medicare 855-A CHOW applications are approved and the tie-in notice is received by Buyer.  Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Authority in respect of any regulatory filing, (ii) permit the other Party the opportunity to review in advance all responses, application or filings made with, or written materials submitted to, any Governmental Authority in connection with any such regulatory filings and incorporate the other Party's reasonable comments, (iii) not participate in any substantive meeting or discussion with any Governmental Authority in respect of any such regulatory filing unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to participate in and/or attend such meeting and/or discussion, and (iv) furnish the other Party with copies of all correspondences, filings, and written communications with any Governmental Authority or its respective staff with respect to any such regulatory filing.

**Section 6.3    Plan of Correction**.  From and after the date hereof until the Closing, in the event that the Texas HHS raises any questions, requests for information, or follow-up inquiries with respect to the Plan of Correction submitted by or on behalf of VCMC prior to the Closing with respect to the Texas HHS Survey, the Sellers shall (a) be responsible for preparing and submitting all responses to Texas HHS, (b) keep Legent Buyer reasonably informed of all material communications with Texas HHS regarding the Plan of Correction, and (c) use commercially reasonable efforts to (i) obtain acceptance of the Plan of Correction by Texas HHS and (ii) secure the reinstatement of the Hospital license. Notwithstanding the foregoing, Sellers shall act in accordance with any reasonable direction provided by Legent Buyer with respect to such responses and related communications.

**Section 6.4    Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall promptly take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to transfer, convey, and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this <u>Section 6.4</u>, to the extent that either Buyer or Sellers discover any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned,

34

Buyer and Sellers shall cooperate and promptly execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.5      Availability of Business Records**.  From and after the Closing, Buyer shall promptly provide to Sellers and their respective Representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all Records included in the Purchased Assets for periods prior to the Closing to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such Records until the latest of (i) three (3) years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, or (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases. Such access shall include access to any information in electronic form to the extent reasonably available. Buyer acknowledges that Sellers have the right to retain copies of all of Records included in the Purchased Assets for periods prior to the Closing. Prior to destroying any Records included in the Purchased Assets for periods prior to the Closing, Buyer shall notify Sellers thirty (30) days in advance of any such proposed destruction of its intent to destroy such Records, and Buyer shall permit Sellers to retain such Records, at Sellers' cost and expense.

**Section 6.6      Use of Name and Marks**.  Except in connection with the Chapter 11 Cases, neither Sellers nor any of their respective Affiliates or Subsidiaries shall use, license or authorize any third party to use, any name, slogan, logo or Trademark which is similar or deceptively similar to any of the names, Trademarks or service marks included in the Intellectual Property included in the Purchased Assets.

**Section 6.7      Data Privacy Protection**.  Buyer acknowledges that the Purchased Assets include personally identifiable information ("PII") within the meaning of Section 363(b) of the Bankruptcy Code, along with associated personal information about Sellers' customers.  In connection with the same, Buyer agrees to: (a) employ appropriate security controls and procedures (technical, operational and managerial) to protect PII and personal information, (b) abide by all applicable Laws and regulations with respect to PII and (c) take such further actions with respect to PII as may be agreed by the Parties.  Sellers agree to take such action reasonably requested by Buyer, including amending their privacy policies with respect to PII, as may be necessary to transfer the PII to Buyer, including sending a notice to the subjects of the PII and giving each such subject the right to object to the transfer of the PII.  Buyer agrees that it shall, absent a customer's consent received after adequate notice: (i) abide by Sellers' privacy policies and privacy-related covenants made in Sellers' terms of service that were in effect as of the Petition Date, (b) respect prior requests of customers to opt out of receipt of marketing messages (to the extent Sellers make Buyer aware of such requests; *provided* that Buyer shall seek to obtain such information from Sellers) and (c) use PII only for the purposes of continuing Business operations and continuing to provide similar goods and services to customers, including marketing the products and services related to the Purchased Assets.  Buyer shall use its reasonable commercial efforts to obtain the consent of a customer for any additional use of PII or other personal information or before making material changes to Sellers' privacy policies that weaken a customer's consumer protection.  Furthermore, to the extent PII includes any social security numbers, Buyer shall limit such use to Tax reporting purposes, and shall purge such information from its databases when such information is no longer required for that purpose.

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**ARTICLE VII.**
**CONDITIONS TO CLOSING**

**Section 7.1     Conditions to Buyer's Obligations**.    Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)     as of the Effective Date and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1 through Section 3.3 and Section 3.5 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in ARTICLE III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)     Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.8(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)     no Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)     Sellers' Texas hospital license (with continuing physician ownership compliance) and Medicare-issued Provider Transaction Access Number (450831) shall be valid, active, and in full force and effect;

(e)     the Sale Order shall have been entered by the Bankruptcy Court, which shall include a waiver of the fourteen (14) day stay set forth in Bankruptcy Rule 6004(h), and shall be a Final Order;

(f)     from the Effective Date until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(g)     Sellers shall have delivered a certificate from an authorized officer of each Seller to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b), and Section 7.1(e) have been satisfied.

**Section 7.2     Conditions to Sellers' Obligations**.    Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

(a)      as of the Effective Date and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1 through Section 4.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in ARTICLE IV shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or the transactions contemplated by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" contained in such representations and warranties shall be disregarded;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)      no Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Sale Order shall have been entered by the Bankruptcy Court and shall be a Final Order;

(e)      Seller shall have received the Purchase Price; and

(f)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) have been satisfied.

**Section 7.3      No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

## ARTICLE VIII.
## TERMINATION

**Section 8.1      Termination of Agreement**.  This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)      by the mutual written consent of Legent Buyer, GrayStreet Buyer, and Sellers;

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

(b)     by either Buyer, on the one hand, or Sellers, on the other hand, if there shall be any applicable Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited or if consummation of the Contemplated Transactions would violate any Final Order of any Governmental Authority having competent jurisdiction;

(c)     by Sellers by giving written notice to Buyer at any time prior to Closing in (i) the event Buyer has breached any representation, warranty, agreement, or covenant contained in this Agreement such that any condition set forth in Section 7.2 shall become incapable of being satisfied without cure, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, (ii) in the event that any condition set forth in Section 7.2 shall become incapable of being satisfied, unless such failure shall be due to the failure of either Seller to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Sellers, or (iii) the Closing has not occurred (other than through the failure of Sellers to comply with their obligations under this Agreement) before or on April 30, 2026;

(d)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event either Seller has breached any representation, warranty, agreement, or covenant contained in this Agreement such that any condition set forth in Section 7.1 shall become incapable of being satisfied without cure, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, (ii) in the event that any condition set forth in Section 7.1 shall become incapable of being satisfied, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing and such condition is not waived by Buyer, or (iii) the Closing has not occurred (other than through the failure of Buyer to comply with their obligations under this Agreement) before or on April 30, 2026; or

(e)     by Buyer if:

(i)     an "Event of Default" is declared by the DIP Lender under the Final DIP Order;

(ii)     if any of the following occurs:

(A)     the Bankruptcy Court enters a Final Order for the appointment of a trustee or examiner with expanded powers, other than at the request of Buyer, under Section 1104 of the Bankruptcy Code and such trustee or examiner takes any action to interfere with or impair the Contemplated Transactions;

(B)     the Chapter 11 Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or the Bankruptcy Court enters a Final Order appointing a trustee or an examiner with expanded powers (beyond those set forth under Section 1106(a)(3) of the Bankruptcy Code) in the Chapter 11 Cases prior to the Closing Date;

(C)     any Seller consummates a Plan in the Chapter 11 Cases that does not authorize or approve the Contemplated Transactions;

38

(D)     any Seller executes an Alternate Agreement or takes affirmative steps to effect an Alternate Transaction; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyer is the Back-Up Bidder; or

(E)     Buyer is not the Winning Bidder at the Auction pursuant to the Bidding Procedures Order; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyer is the Back-Up Bidder.

**Section 8.2    Procedure Upon Termination**.    In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3    Effect of Termination**.

(a)     Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)     No termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the Contemplated Transactions are not consummated (i) this Agreement shall become null and void and of no further force and effect (except that ARTICLE I (*Definitions*), ARTICLE IX (*Miscellaneous*), and this ARTICLE VIII shall survive any such termination), and (ii) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this ARTICLE VIII or by Sellers for any reason other than under Section 8.1(d), Sellers shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further Liability of any kind to Sellers, any of its Affiliates, or any third party on account of this Agreement.

(c)     Nothing herein shall preclude any Party from exercising their respective remedies under Section 9.1.

**ARTICLE IX.**
**MISCELLANEOUS**

**Section 9.1    Remedies**. Each of Buyer and Sellers recognize that if it breaches or refuses to perform any covenant set forth in this Agreement, monetary damages alone would not be adequate to compensate the other Party for its injuries. Each Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants. If any Litigation is brought by a Party to enforce such covenants, the other Party against which such Litigation is subject shall waive the defense that there is an adequate remedy at Law. Buyer and each Seller agrees to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants. Buyer and each Seller agrees that

39

the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 9.2** **Expenses**.  Except for the Bid Protections and as otherwise provided in this Agreement or a Related Agreement, each of Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing Party in such action or proceeding (i.e., the Party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing Party such costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) as the prevailing Party may incur in the pursuit or defense thereof.

**Section 9.3** **Entire Agreement**.  This Agreement, the Related Agreements and all related exhibits and schedules constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements, representations and warranties (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof; provided, however, the Confidentiality Agreement shall survive in accordance with its terms.  In the event of any inconsistency between the statements in the body of this Agreement and the Related Agreements and the related Exhibits and Schedules, the statements in the body of this Agreement shall control. The Parties have not relied on any statement, representation, warranty, or agreement of the other Party or of any other person on such Party's behalf, including any representations, warranties, or agreements arising from statute or otherwise in law, except for the representations, warranties, or agreements expressly contained in this Agreement.  The recitals set forth above are expressly incorporated herein by reference.

**Section 9.4** **Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules to this Agreement (the "Schedules"), the Disclosure Schedule, the exhibits to this Agreement, and the documents and other information made available in the Disclosure Schedules are incorporated herein by reference and made a part hereof.

**Section 9.5** **Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action

40

or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

Section 9.6     **Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that either Buyer may elect to assign any or all of its rights arising under this Agreement or to elect to have the Purchased Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more designees, in each case without the consent of any of Sellers; provided, however, each Buyer shall remain liable for all of its obligations to Sellers under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a Plan confirmed in the Chapter 11 Cases or pursuant to a Final Order of the Bankruptcy Court.

Section 9.7     **Notices**.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) when sent by email (with written confirmation of transmission), or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller, then to:

Dynacq Healthcare, Inc.
4301 Vista Rd.,
Pasadena, Texas 77504
Attention:  Dr. Eric Chan
Email: eric.chan@dynacq.com

with a copy to (which does not constitute notice):

Dykema Gossett PLLC
5 Houston Center
1401 McKinney Street, Suite 1625
Houston, Texas 77010
Attention:  William Hotze and Dominique Douglas
Email:  whotze@dykema.com / ddouglas@dykema.com

If to Legent Buyer, then to:

c/o PSN Services, LLC
4090 Mapleshade Lane, Ste. 220
Plano, Texas 75093
Attention: Jordan Fowler and Jeffrey M. Peterson
Email: jfowler@legenthealth.com / jpeterson@legenthealth.com

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

with copies (which shall not constitute notice) to:

> McDermott Will & Emery LLP
> 333 Avenue of the Americas, Suite 4500
> Miami, Florida 33131-4336
> Attention:  Danielle Golino / Gregg Steinman
> Email: dgolino@mcdermottlaw.com / gsteinman@mcdermottlaw.com

If to GrayStreet Buyer, then to:

> GrayStreet BIB Credit, LLC
> c/o Kevin Covey
> 4515 San Pedro Ave
> San Antonio, Texas 78212

with copies (which shall not constitute notice) to:

> Munsch Hardt Kopf & Harr P.C
> 500 N. Akard St., Ste. 4000
> Dallas, Texas 75201
> Attention: Julian P. Vasek
> Email: jvasek@munsch.com

> and

> Munsch Hardt Kopf & Harr P.C.
> 700 Milam St., Ste. 800
> Houston, Texas 77002
> Attention: John D. Cornwell
> Email: jcornwell@munsch.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

**Section 9.8** **Governing Law; Jurisdiction**.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Texas without giving effect to any choice or conflict of Law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Law.  Prior to the closing of the Chapter 11 Cases, the Parties hereto agree that any Litigation seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, any Related Agreement or the Contemplated Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Litigation and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Litigation in the Bankruptcy Court or that any such Litigation which is brought in the Bankruptcy Court has been brought in an inconvenient forum; *provided* that if the Bankruptcy Court is unwilling or

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

unable to hear any such Litigation, then the federal courts of the United States of America sitting in Harris County, Texas, shall have exclusive jurisdiction over such Litigation.

**Section 9.9    Severability**.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.10    No Third-Party Beneficiaries**.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.11    No Survival of Representations, Warranties and Agreements**.  None of the Parties' representations, warranties, covenants and other agreements in this Agreement, including any rights of any other Party or any third party arising out of any breach of such representations, warranties, covenants and other agreements, shall survive the Closing, except for (i) those covenants and agreements contained herein that by their terms apply or are to be performed in whole or in part after the Closing, (ii) this ARTICLE IX, and (iii) all defined terms set forth in ARTICLE I that are referenced in the foregoing provisions referred to in clauses (i) and (ii) above.

**Section 9.12    Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the Effective Date." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**Section 9.13**   **Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.14**   **Mutual Drafting**.   Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.15**   **Disclosure Schedule**.  All capitalized terms not defined in the Disclosure Schedule shall have the meanings ascribed to them in this Agreement. The representations and warranties of Sellers in this Agreement are made and given, and the covenants are agreed to, subject to the disclosures and exceptions set forth in the Disclosure Schedule. The disclosure of any matter in any section of the Disclosure Schedule shall be deemed to be a disclosure with respect to any other sections of the Disclosure Schedule to which such disclosed matter reasonably relates, but only to the extent that such relationship is reasonably apparent on the face of the disclosure contained in the Disclosure Schedule. The listing of any matter shall expressly not be deemed to constitute an admission by Sellers, or to otherwise imply, that any such matter is material, is required to be disclosed under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement. No disclosure in the Disclosure Schedule relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. In no event shall the disclosure of any matter in the Disclosure Schedule be deemed or interpreted to expand the scope of Sellers' representations, warranties and/or covenants set forth in this Agreement. All attachments to the Disclosure Schedule are incorporated by reference into the Disclosure Schedule in which they are directly or indirectly referenced.

**Section 9.16**   **Non-Recourse**. No past, present or future director, officer, employee, incorporator, member, partner, or equity holder of Buyer or any Seller shall have any liability for any obligations or liabilities of such Party under this Agreement or any other Related Agreement, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby.

**Section 9.17**   **Headings; Table of Contents**.   The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.18**   **Counterparts; Facsimile and Email Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile, email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

**Section 9.19**   **Time of Essence**.  Time is of the essence of this Agreement.

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

IN WITNESS WHEREOF, the Parties have caused this Assignment to be duly executed by their respective authorized Representatives as of the Effective Date.

<u>SELLERS</u>:

**DYNACQ HEALTHCARE, INC.,**

By: _____
Name: Dr. Eric Chan
Title: President and Chief Executive Officer

**VISTA COMMUNITY MEDICAL CENTER, L.L.P.**

By: _____
Name: Dr. Eric Chan
Title: President and Chief Executive Officer

**VISTA LAND & EQUIPMENT, L.L.C.**

By: _____
Name: Dr. Eric Chan
Title: President and Chief Executive Officer

**DOCTORS PRACTICE MANAGEMENT, INC.**

By: _____
Name: Dr. Eric Chan
Title: President and Chief Executive Officer

**SURGERY SPECIALTY CLINICIANS, INC.**

By: _____
Name: Dr. Eric Chan
Title: President and Chief Executive Officer

**VISTA HOSPITAL OF DALLAS, L.L.P.**

By: _____
Name: Dr. Eric Chan
Title: President and Chief Executive Officer

**AMBULATORY INFUSION THERAPY
SPECIALISTS, INC.**

Signed by:

By: _____

A2C249D64FCA4DE...

Name: Dr. Eric Chan
Title: President and Chief Executive Officer

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**GRAYSTREET BUYER**:

**GRAYSTREET BIB CREDIT, LLC**

By: _____
Name: Kevin Covey
Title: Partner


**LEGENT BUYER**:

**LEGENT HOSPITAL NORTHWEST HOUSTON, LLC, D/B/A LEGENT NORTH HOUSTON SURGICAL HOSPITAL**

By: _____
Name: Jordan Fowler
Title: Chief Executive Officer

**GRAYSTREET BUYER**:

**GRAYSTREET BIB CREDIT, LLC**

By: _____
Name: Kevin Covey
Title: Manager


**LEGENT BUYER**:

**LEGENT HOSPITAL NORTHWEST HOUSTON, LLC, D/B/A LEGENT NORTH HOUSTON SURGICAL HOSPITAL**

By: _____
Name: Jordan Fowler
Title: Chief Executive Officer

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**EXHIBIT A-1**

**LEGENT BUYER BILL OF SALE**

[*See attached*]

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**EXHIBIT A-2**

**GRAYSTREET BUYER BILL OF SALE**

[*See attached*]

## EXHIBIT B-1

## <u>LEGENT BUYER ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

[*See Legent Buyer Bill of Sale of Assignment and Assumption Agreement (Exhibit A-1)*]

**EXHIBIT B-2**

**GRAYSTREET BUYER ASSIGNMENT AND ASSUMPTION AGREEMENT**

[*See attached*]

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

## EXHIBIT C

**FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

[*See Attached*]

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

## EXHIBIT D

## FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT

*[See Attached]*

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**EXHIBIT E**

**RESERVED**

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**EXHIBIT F**

**<u>REAL PROPERTY DEED</u>**

*[See attached]*

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**EXHIBIT G**

**LICENSES AND PERMITS**

| License /Provider Number | Licensee Name & Address | License Number | Issue Date | Expiration Date |
|---|---|---|---|---|
| Medicare ID 450831 | Vista Community Medical Center, L.L.P. | 450831 | 07/07/2010 | None |
| NPI | Vista Community Medical Center, L.L.P. | 1891718789 | | None |
| Texas Department of State Health Services ("TDSHS") Hospital License | Surgery Specialty Hospitals of America Southeast Houston 4301-B Vista, Pasadena, TX 77504 | 006941 | 04/16/1999 | 04/30/2026 |
| DEA | Surgery Specialty Hospitals of America Southeast Houston 4301 Vista Road, Pasadena, TX 77504 | BV6277924 | 02/25/2026 | 02/28/2029 |
| Texas Board of Pharmacy License (Hospital – Independent) | Surgery Specialty Hospitals of America | 19541 | 04/23/1999 | 04/30/2027 |

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

| License /Provider Number | Licensee Name & Address | License Number | Issue Date | Expiration Date |
|---|---|---|---|---|
| | Southeast Houston<br><br>4301 Vista Road, Pasadena, TX 77504 | | | |
| TDSHS<br><br>X-Ray Registration | Surgery Specialty Hospitals of America Southeast Houston<br><br>4301 Vista Road, Pasadena, TX 77504 | R17026 | 01/01/1989 | 08/31/2030 |
| CLIA Laboratory Certification | Surgery Specialty Hospitals of America Southeast Houston<br><br>4301 Vista Road, Pasadena, TX 77504 | 45D0496271 | 09/01/1992 | 12/22/2027 |
| Center for Improvement in Healthcare Quality ("CIHQ") Accreditation | Vista Community Medical Center, L.L.P. d/b/a Surgery Specialty Hospitals of America | CIHQ ID: 1250 | 03/01/2025 | 03/01/2028 |

| License /Provider Number | Licensee Name & Address | License Number | Issue Date | Expiration Date |
|---|---|---|---|---|
| | 4301 Vista Road, Pasadena, TX 77504 | | | |
| Commission on Laboratory Accreditation (COLA) Laboratory Accreditation | Vista Community Medical Center, L.L.P. d/b/a Surgery Specialty Hospitals of America<br><br>4301 Vista Road, Pasadena, TX 77504 | 7481 | 8/19/2024 | 08/19/2026 |

DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**EXHIBIT H**

**REGULATORY FILINGS**

1. **At or prior to the Closing, VCMC shall submit a 855-A change of ownership filing to CMS with respect to Medicare ID 450831.**

2. **At or prior to the Closing, Legent Buyer shall submit a 855-A change of ownership filing to CMS with respect to Medicare ID 450831.**

# EXHIBIT I

## <u>NON-FOREIGN STATUS AFFIDAVIT</u>

[*See attached*]

# EXHIBIT J

## <u>ALLOCATION SCHEDULE</u>

[*See attached*]

127421.000002  4936-5916-7888.24
DM_US 216420145-23.120967.0021
DM_US 216420145-23.120967.0021

**DISCLOSURE SCHEDULES**

**TO**

**AMENDED ASSET PURCHASE AGREEMENT**

**by and among**

**DYNACQ HEALTHCARE, INC.,**

**VISTA COMMUNITY MEDICAL CENTER, L.L.P.,**

**VISTA LAND & EQUIPMENT, L.L.C.,**

**DOCTORS PRACTICE MANAGEMENT, INC.,**

**SURGERY SPECIALTY CLINICIANS, INC.,**

**VISTA HOSPITAL OF DALLAS, L.L.P.,**

**and**

**AMBULATORY INFUSION THERAPY SPECIALISTS, INC.,**

**as Sellers,**

**and**

**GRAYSTREET BIB CREDIT, LLC,**

**as GrayStreet Buyer,**

**and**

**LEGENT HOSPITAL NORTHWEST HOUSTON, LLC,**
**D/B/A LEGENT NORTH HOUSTON SURGICAL HOSPITAL,**

**as Legent Buyer.**

**Dated as of March 20, 2026**

4925-2858-2030.12

**DISCLOSURE SCHEDULES**

These disclosure schedules (collectively, "Disclosure Schedules") are provided pursuant to that Amended Asset Purchase Agreement, dated March 20, 2026 (the "Agreement"), by and among Dynacq Healthcare, Inc., a Nevada corporation ("Dynacq"); Vista Community Medical Center, L.L.P., a Texas limited liability partnership ("VCMC"); Vista Land & Equipment, L.L.C., a Texas limited liability company ("VLE"); Doctors Practice Management, Inc., a Texas corporation ("DPM"); Surgery Specialty Clinicians, Inc., a Texas corporation ("SSC"); Vista Hospital of Dallas, L.L.P., a Texas limited liability partnership ("VHD"); Ambulatory Infusion Therapy Specialists, Inc., a Texas corporation ("AITS" and together with Dynacq, VCMC, VLE, DPM, SSC, and VHD, the "Sellers" and each individually, a "Seller"), GrayStreet BIB Credit, LLC ("GrayStreet Buyer"), and Legent Hospital Northwest Houston, LLC, d/b/a Legent North Houston Surgical Hospital ("Legent Buyer"); (GrayStreet Buyer and Legent Buyer are referred to herein collectively as the "Buyer"; and Sellers together with Buyer, are collectively, referred to as the "Parties" and each, individually, a "Party"). Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Agreement.

The headings contained in these Disclosure Schedules are for convenience of reference purposes only and will not affect in any way the meaning or interpretation of the Agreement or these Disclosure Schedules. No reference to or disclosure of any item or other matter in these Disclosure Schedules will be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in these Disclosure Schedules. No disclosure in these Disclosure Schedules relating to any possible breach or violation of any Contract or Law will be construed as an admission or indication that any such breach or violation exists or has actually occurred.

No information contained in these Disclosure Schedules will be deemed to be contained in any other section of these Disclosure Schedules unless (i) included therein (by cross reference or specific reference) or (ii) it would be reasonably apparent that such disclosure is applicable to other sections of these Disclosure Schedules.

Unless otherwise specified, documents attached to or delivered with any section of these Disclosure Schedule are incorporated in their entirety into such section. These Disclosure Schedules and any documents attached to or delivered with these Disclosure Schedule are qualified in their entirety by reference to specific provisions of the Agreement, and are not intended to constitute, and shall not be construed as constituting, any representation or warranty of the disclosing party, except as and to the extent expressly provided in the Agreement. All descriptions of agreements or other matters appearing herein are summary in nature and are qualified by reference to the complete documents.

4925-2858-2030.12

**INDEX OF SCHEDULES**

| | |
|---|---|
| Schedule 1(a) | GrayStreet Permitted Liens |
| Schedule 1(b) | Legent Permitted Liens |
| Schedule 2.1(a)(i) | Real Property |
| Schedule 2.1(a)(ii) | Leases |
| Schedule 2.1(b)(i) | Excluded Personal Property |
| Schedule 2.5(a)(iii) | Assumed Liabilities |
| Schedule 2.6(a)(i) | Contracts and Cure Amounts |
| Schedule 3.3 | Regulatory Filings |
| Schedule 3.4 | Exceptions to Compliance with Laws |
| Schedule 3.6 | Assumed Contracts |
| Schedule 3.7 | Intellectual Property |
| Schedule 3.8 | Litigation |
| Schedule 3.9 | Permits |
| Schedule 3.10(b) | Number of operating rooms, procedure rooms, and beds |
| Schedule 3.10(d) | Physician Ownership |
| Schedule 5.4 | Conduct of Business |

4925-2858-2030.12

**Schedule 1(a)**

**GrayStreet Permitted Liens**

1. The Final DIP Order;
2. Property Tax Loan between TaxCore Lending, LLC and Vista Land and Equipment, L.L.C. dated February 26, 2025 (the "Tax Lien Contract").

4925-2858-2030.12

**Schedule 1(b)**

**Legent Permitted Liens**

None.

4925-2858-2030.12

**Schedule 2.1(a)(i)**

**Real Property**

| Debtor Entity | Type of Property | Legal Description |
|---|---|---|
| Vista Land & Equipment, L.L.C. | Acreage | LT 14A South Houston Gardens 5 Par RP |
| Vista Land & Equipment, L.L.C. | Acreage | LT 14B South Houston Gardens 5 Par RP |

4.5799 acres of land being the residue of Lot 14 of South Houston Gardens, Section 5, as recorded in Volume 4, Page 15 of the Map Records of Harris County, Texas, and lying in the Day Land and Cattle Company Survey, Abstract No. 1025, Harris County, Texas, said 4.5799 acres of land being more particularly described by metes and bounds as follows:

BEGINNING at a ½ inch iron rod found in the northerly Right-Of-Way line of Vista Road (based on a 100.00 foot Right-Of-Way), said iron rod being the northwest corner of a called 10,500 square foot tract of land conveyed to the City of Pasadena, Texas (for Vista Road), as recorded under Harris County Clerk's File No. E264049, with the common line of Lots 13 and 14 of South Houston Gardens, Section 5, from said iron rod a 5/8 inch iron rod was found 1.56 feet north and 1.32 feet west;

THENCE North along the common line of said Lot 13 and 14, a distance of 560.00 feet to a ½ inch iron rod set for corner in the south line of Lot 12, same iron being the northwest corner of Lot 14 and the northeast corner of Lot 13;

THENCE South 89[46'41" East along the common line of Lots 12 and 14, a distance of 350.00 feet to a ½ inch iron rod set for corner, same iron rod being the common corner of Lots 12, 14, 15, and 17;

THENCE South along the common line of said Lot 14 and 15, a distance of 580.00 feet to an "X" found in concrete for corner in the northerly Right-Of-Way line of said Vista Road, same being the Northeast corner of said 10,500 square foot tract;

THENCE North 86[30'30" West (called North 86[44' West) along the northerly Right-Of-Way line of said Vista Road, same being the northerly line of said 10,500 square foot tract, a distance of 350.65 feet (called 350.57 feet) to the PLACE OF BEGINNING and containing within these calls 199,499 square feet or 4.5799 acres of land.

4925-2858-2030.12

**Schedule 2.1(a)(ii)**

**Leases**

1. Commercial Lease Agreement, dated April 1, 2025, between Vista Land & Equipment, L.L.C. and Jose Majano, D.C. (security deposit balance $1,992).
2. Hospital Lease Agreement, dated May 1, 2005, between Vista Land and Equipment, L.L.C. and Vista Community Medical Center, L.L.P.

4925-2858-2030.12

**Schedule 2.1(b)(i)**

**Excluded Personal Property**

None.

4925-2858-2030.12

**Schedule 2.5(a)(iii)**

**Assumed Liabilities**

| Assumed Liabilities | Amount |
| --- | --- |
| Assigned Contracts (Post-Closing) | Legent Buyer: None<br><br>GrayStreet Buyer: Policy No. MXI93094939 (described in more detail in Schedule 3.6) |
| Cure Costs | Legent Buyer: None<br><br>GrayStreet Buyer: None |
| Ad Valorem Taxes (Post-Closing) | Legent Buyer: None<br><br>GrayStreet Buyer: All Post-Closing |
| Other Post-Closing Liabilities | Legent Buyer: None<br><br>GrayStreet Buyer: None |

4925-2858-2030.12

**Schedule 2.6(a)(i)**

**Contracts and Cure Amounts**

| Debtor Entity | Contract | Contract Counterparty | Cure Cost | Description of Contract |
|---|---|---|---|---|
| Vista Community Medical Center, L.L.P. | Maintenance Agreement - Sterrad NX Serial number 33120644 dated 7/15/2021 | Advanced Sterilization Products | $                - | Service Agreements |
| Vista Community Medical Center, L.L.P. | Maintenance Agreement - Sterrad NX Serial number 33120644 dated 7/15/2021 | Advanced Sterilization Products | $                - | Service Agreements |
| Vista Community Medical Center, L.L.P. | Maintenance Agreement - EVOTECH(TM)SYSTEM 208V, Serial No. 5041120178 (77FULLMF08); STERRAD NX, Serial No. 33120644 (77FULLMF05) | Advanced Sterilization Products | $        6,570.64 | Service Agreements |
| Vista Community Medical Center, L.L.P. | Maintenance Agreement - STERRAD NX, Serial No. 33120644 (77FULLMF06) | Advanced Sterilization Products | $                - | Service Agreements |
| Vista Community Medical Center, L.L.P. | Maintenance Agreement - STERRAD NX, Serial No. 33120644 (77FULLMF05) | Advanced Sterilization Products | $                - | Service Agreements |
| Dynacq Healthcare, Inc. | Commerical Property - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |
| Vista Community Medical Center, L.L.P. | Commerical Property - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |
| Vista Land & Equipment, L.L.C. | Commerical Property - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |
| Doctors Practice Management, Inc. | Commerical Property - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |
| Surgery Specialty Clinicians, Inc. | Commerical Property - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |
| Vista Hospital of Dallas, L.L.P. | Commerical Property - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |
| Ambulatory Infusion Therapy Specialists, Inc. | Commerical Property - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |
| Dynacq Healthcare, Inc. | Commercial General Liability - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |
| Vista Community Medical Center, L.L.P. | Commercial General Liability - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $                - | Insurance Agreements |

4925-2858-2030.12

| | | | | |
|---|---|---|---|---|
| Vista Land & Equipment, L.L.C. | Commercial General Liability - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $ - | Insurance Agreements |
| Doctors Practice Management, Inc. | Commercial General Liability - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $ - | Insurance Agreements |
| Surgery Specialty Clinicians, Inc. | Commercial General Liability - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $ - | Insurance Agreements |
| Vista Hospital of Dallas, L.L.P. | Commercial General Liability - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $ - | Insurance Agreements |
| Ambulatory Infusion Therapy Specialists, Inc. | Commercial General Liability - Policy No. MXI93094939 | AGCS Marine Insurance Company, | $ - | Insurance Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Professional Medical Services (5/1/2020) | American Surgical Professionals, Inc. | $ 150.00 | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical | Anesthesia Associates of Houston Metroplex | $ 419,275.06 | Medical Services Agreements |
| Dynacq Healthcare, Inc. | Consulting Services - IT | Azaela Health Innovations, Inc. | $ - | Consulting & Independent Contractors |
| Vista Community Medical Center, L.L.P. | InSource Health Services Members Commitment - Drug Provider | Bergen Brunswick Drug Company | $ 50,130.18 | Supply Agreements |
| Vista Community Medical Center, L.L.P. | Equipment - Remote Cardica Monitoring Machines & License for Embedded Software | Biotricity | $ - | Equipment Leases |
| Vista Community Medical Center, L.L.P. | Business Associate Agreement - 10.9.2019 | Biotricity | $ - | Business Associate Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Accounting - Medicare and Medicaid cost report | BKD LLP | $ - | Consulting & Independent Contractors |
| Vista Community Medical Center, L.L.P. | Professional Services - Hospital | Blue Cross and Blue Shield of Texas | $ 40,811.94 | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Equipment & Software - Pyxis | Carefusion Solutions, LLC | $ 97,981.78 | Equipment Leases |
| Vista Community Medical Center, L.L.P. | Equipment & Software - Pyxis - Amendment to Support Terms | Carefusion Solutions, LLC | $ - | Equipment Leases |
| Vista Community Medical Center, L.L.P. | Customer No. 1000192564 | Carefusion Solutions, LLC | $ - | License Agreements |
| Vista Community | Equipment Maintenance | Clifford Power | $ - | Service Agreements |

4925-2858-2030.12

| | | | | |
|---|---|---|---|---|
| Medical Center, L.L.P. | Agreement - Pasadena, TX - Cummins, Generac & Stamford Generators | Systems, Inc.. | | |
| Vista Community Medical Center, L.L.P. | Professional Services - Health Maintenance | Community Health Choice, Inc. | $ - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Equipment Supplier - Durable Medical Equipment | Compression Solutions, LLC | $ - | Supply Agreements |
| Vista Community Medical Center, L.L.P. | Software License Agreement | Doctors Practice Management, Inc. | $ - | License Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Credentialing | Dominique, Robin | $ - | Consulting & Independent Contractors |
| Vista Community Medical Center, L.L.P. | License Agreement No. 31525 for EPCS | DrFirst.com, Inc. | $ - | License Agreements |
| Vista Community Medical Center, L.L.P. | License Agreement - EPCS, RCOP and IPSCB | DrFirst.com, Inc. | $ - | License Agreements |
| Dynacq Healthcare, Inc. | Bond No. 61BDDBW7157 | Dynacq Healthcare, Inc. 401(k) Plan | $ - | Insurance Agreements |
| Dynacq Healthcare, Inc. | Bond No. 61BDDHS8326 | Dynacq Healthcare, Inc. 401(k) Plan | $ - | Insurance Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical - Radiology | El Paso Vinton Diagnostics. P.A | $ - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Clinical Pharmacology | Elsevier, Inc. | $ - | License Agreements |
| Vista Community Medical Center, L.L.P. | Purchase Agreement - ERCOT Energy - Lg Commercial Agmt 022520 | Entrust Energy | $ - | Utility Agreements |
| Vista Community Medical Center, L.L.P. | Purchase Agreement - ERCOT Energy - Lg Commercial Agmt 062119 | Entrust Energy | $ - | Utility Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical - hemodialysis services | Five Star Dialysis LLC | $ 58,000.00 | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical - Blood Center | Gulf Coast Regional Blood Center | $ - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Subscription Agreement - Software & Marketing and Debit Card Processing | iCare Financial | $ - | Credit Card Processing Agreements |
| Vista Community Medical Center, L.L.P. | Defines Scope and Key Business Terms in Master Services Agreement | iCare.com LLC | $ - | MSA's |
| Vista Community Medical Center, L.L.P. | Professional Services and Software License Agreements | iCare.com LLC | $ 23,705.45 | License Agreements |
| Dynacq Healthcare, Inc. | Professional Services and Software License Agreements | iCare.com LLC | $ - | License Agreements |

| | | | | | |
|---|---|---|---|---|---|
| Dynacq Healthcare, Inc. | General Liability - Policy No. 0100159980-4 | Kinsale Insurance Company | $ | - | Insurance Agreements |
| Vista Community Medical Center, L.L.P. | General Liability - Policy No. 0100159980-4 | Kinsale Insurance Company | $ | - | Insurance Agreements |
| Vista Land & Equipment, L.L.C. | General Liability - Policy No. 0100159980-4 | Kinsale Insurance Company | $ | - | Insurance Agreements |
| Doctors Practice Management, Inc. | General Liability - Policy No. 0100159980-4 | Kinsale Insurance Company | $ | - | Insurance Agreements |
| Surgery Specialty Clinicians, Inc. | General Liability - Policy No. 0100159980-4 | Kinsale Insurance Company | $ | - | Insurance Agreements |
| Vista Hospital of Dallas, L.L.P. | General Liability - Policy No. 0100159980-4 | Kinsale Insurance Company | $ | - | Insurance Agreements |
| Ambulatory Infusion Therapy Specialists, Inc. | General Liability - Policy No. 0100159980-4 | Kinsale Insurance Company | $ | - | Insurance Agreements |
| Dynacq Healthcare, Inc. | Professional Services - Legal | Law Office of David F. Bragg | $ | - | Business Associate Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Legal | Law Office of David F. Bragg | $ | - | Business Associate Agreements |
| Vista Hospital of Dallas, L.L.P. | Professional Services - Legal | Law Office of David F. Bragg | $ | - | Business Associate Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical - Donation | LifeGift Organ Donation Center | $ | - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Quality Improvement Organization (QIO) Program | Livanta LLC | $ | - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical Transportation | Loop Routes, LLC | $ | 7,725.00 | Medical Services Agreements |
| Vista Land & Equipment, L.L.C. | Real Property Lease - 4301 Vista Road, Suite 107, Pasadena, TX 77504 | Majano DC, Jose | $ | 1,992.00 | Real Estate Real Property Leases |
| Vista Community Medical Center, L.L.P. | Professional Services - Pathology | Mangini, Lakhia and Associates, P.A. | $ | - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Services & HIPAA requirements | MCG Health, LLC | $ | - | Business Associate Agreements |
| Vista Community Medical Center, L.L.P. | Software License Agreement - Patient Care | MCG Health, LLC | $ | - | License Agreements |
| Vista Community Medical Center, L.L.P. | Amends Compensation Provisions in original Hospital Services Agreement | Molina Healthcare of Texas | $ | - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Healthcare Plan Participation Agreement | Molina Healthcare of Texas | $ | - | Medical Services Agreements |
| Vista Community Medical Center, | Professional Services - Qualifications | National Neuromonitoring | $ | 750.00 | Consulting & Independent Contractors |

4925-2858-2030.12

| L.L.P. | | Services, LLC | | |
|---|---|---|---|---|
| Vista Community Medical Center, L.L.P. | Professional Services - Intraoperative Neuromonitoring | National Neuromonitoring Services, LLC | $ - | Consulting & Independent Contractors |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical - Surgery Assistant | Nii-Otabil Nelson, M.D. | $ 2,000.00 | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Quality Improvement Organization (QIO) Program | Ohio KEPRO, Inc. | $ - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Clinical Lab Testing | Quest Diagnostics Irving Laboratory | $ 1,383.73 | Service Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical | Redwood Health Corporation | $ 1,375,200.00 | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical Staff | Redwood Health Corporation | $ 471,400.00 | Consulting & Independent Contractors |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical - ACUTE DIALYSIS SERVICES | Renal Touch, LLC | $ - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical Training for Enrolled Students | San Jacinto Community College District | $ - | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Software License Agreement - Patient Admission - Engagement Solutions | Simple Admit LLC | $ 671.54 | License Agreements |
| Dynacq Healthcare, Inc. | Software License Agreement - Patient Admission - Engagement Solutions | Simple Admit LLC | $ - | License Agreements |
| Vista Community Medical Center, L.L.P. | Professional Services - Medical - Radiology | Singh M.D., Heram b K. | $ 1,846.54 | Medical Services Agreements |
| Vista Community Medical Center, L.L.P. | Services - Security Patrol - 4301 Vista Rd., Pasadena, TX 77504 | Smith Protective Services | $ - | Service Agreements |
| Vista Community Medical Center, L.L.P. | Services - secure destruction of records | Southern Shred | $ - | Service Agreements |
| Vista Community Medical Center, L.L.P. | License No. 006941 | State of Texas | $ - | Government/Regulatory Licenses |
| Vista Community Medical Center, L.L.P. | Biohazardous Regulated Medical Waste Disposal - Account/Site #2096053-001 | Stericycle | $ - | Service Agreements |
| Vista Community Medical Center, L.L.P. | Equipment Lease & Maintenance Agreement | Steris Corporation | $ 37,415.93 | Equipment Leases |
| Vista Community Medical Center, | Contract No. 07 020 20181210 - Bi Directional | StudyCast | $ 577.47 | Service Agreements |

4925-2858-2030.12

| | | | | |
|---|---|---|---|---|
| L.L.P. | HL7 Interface and maintenance | | | |
| Dynacq Healthcare, Inc. | Professional Liability - Policy No. TX113678 | Texas Medical Liability Insurance Underwriting Association | $ - | Insurance Agreements |
| Vista Community Medical Center, L.L.P. | Professional Liability - Policy No. TX113678 | Texas Medical Liability Insurance Underwriting Association | $ - | Insurance Agreements |
| Vista Land & Equipment, L.L.C. | Professional Liability - Policy No. TX113678 | Texas Medical Liability Insurance Underwriting Association | $ - | Insurance Agreements |
| Doctors Practice Management, Inc. | Professional Liability - Policy No. TX113678 | Texas Medical Liability Insurance Underwriting Association | $ - | Insurance Agreements |
| Surgery Specialty Clinicians, Inc. | Professional Liability - Policy No. TX113678 | Texas Medical Liability Insurance Underwriting Association | $ - | Insurance Agreements |
| Vista Hospital of Dallas, L.L.P. | Professional Liability - Policy No. TX113678 | Texas Medical Liability Insurance Underwriting Association | $ - | Insurance Agreements |
| Ambulatory Infusion Therapy Specialists, Inc. | Professional Liability - Policy No. TX113678 | Texas Medical Liability Insurance Underwriting Association | $ - | Insurance Agreements |
| Vista Community Medical Center, L.L.P. | Services - Medical - Linen Supplies | Texas Textile Services | $ - | Supply Agreements |
| Vista Community Medical Center, L.L.P. | Services & HIPAA requirements | The Accreditation Association for Hospitals and Health Systems | $ - | Business Associate Agreements |
| Vista Community Medical Center, L.L.P. | Consulting Services - IT | Townsend, Bradley | $ - | Consulting & Independent Contractors |
| Vista Community Medical Center, L.L.P. | Software License Agreement | Twin Sails Technology Group, Inc. | $ - | License Agreements |
| Vista Community Medical Center, L.L.P. | Service Agreement - analysis of practice & procedures | University of Texas Health Science Center at Houston | $ 1,004.00 | Service Agreements |
| Vista Community Medical Center, L.L.P. | HIPAA BUSINESS ASSOCIATE AGREEMENT | VerityStream, Inc. | $ 5,449.66 | Business Associate Agreements |
| Vista Community Medical Center, L.L.P. | Software License Agreement | VerityStream, Inc. | $ - | License Agreements |
| Vista Community Medical Center, L.L.P. | Consignment - Medical Device Inventory - Account# 12167222 | W. L. Gore & Associates, Inc. | $ 201,037.00 | Supply Agreements |

4925-2858-2030.12

4925-2858-2030.12

**Schedule 3.3**

**Regulatory Filings**

1. Prior to the Closing, VCMC shall update its Centers for Medicare & Medicaid Services ("CMS") enrollment for Medicare ID 450831 issued to the Hospital to accurately disclose (i) all individuals and entities that hold at least a 5% direct or indirect ownership interest in VCMC, and (ii) that the Hospital is a physician-owned hospital.

2. At or prior to the Closing, VCMC shall submit to CMS an 855-A change of ownership filing with respect to Medicare ID 450831 issued to the Hospital.

3. At or prior to the Closing, Legent Buyer shall submit to CMS an 855-A change of ownership filing with respect to Medicare ID 450831 issued to the Hospital.

4. Following the Closing, Legent Buyer shall have the right, exercisable in its sole discretion, to provide notices to any Governmental Authorities with respect to the Assumed Permits, other than Medicare ID 450831, indicating whether such Assumed Permits will be relinquished or assigned to Legent Buyer or its assignee.

4925-2858-2030.12

**Schedule 3.4**

**Exceptions to Compliance with Laws**

1.  Letter dated March 10, 2026, from the Texas Health and Human Services Commission (Stephanie Muth, Executive Commissioner) to Surgery Specialty Hospitals of America Se Houston (Administrator) and the related State Forms for State Deficiencies for the Surgery Specialty Hospitals of American SE Houston from the Texas Health and Human Service Commission for the Date of Survey Completed on February 19, 2026, and Form Printed on March 10, 2026 with regard to the ongoing mold remediation effort.

2.  2023/2024 Fire Extinguisher/Sprinkler Issue Citation.

4925-2858-2030.12

## Schedule 3.6

### Assigned Contracts

1. GrayStreet Buyer: Policy No. MXI93094939, issued by AGCS Marine Insurance Company with respect to the property located at 4301 Vista Road, Pasadena, TX 77504.

2. Legent Buyer: None.

4925-2858-2030.12

**Schedule 3.7**

**Intellectual Property**

(i)

1.  Domain Name: www.ssha.us.com

(ii)

CareFusion Software Services agreement between CareFusion Solutions, LLC and Surgery Specialty Hospitals of America dated January 31, 2015.

Pyxis Equipment and Integral Software agreement between CareFusion Solutions, LLC and Surgery Specialty Hospitals of America dated January 31, 2025.

iCare Master Subscription Agreement between iCare.com LLC and Surgery Specialty Hospitals of America dated August 13, 2018.

Master Services Agreement between VerityStream, Inc. and Surgery Specialty Hospitals of America dated January 28, 2021.

Studycast Services Agreement between Core Sound Imaging, Inc. and Surgery Specialty Hospitals of America dated January 14, 2019.

(iii)

None.

4925-2858-2030.12

**Schedule 3.8**

**Litigation**

1. *Vista Med. Ctr. Hosp. v. Tex. Mut. Ins. Co.*, Case No. 03-21-00242-CV, Tex. App.–Austin (the "Stop-Loss Litigation")[1];

    General Description: Stop-Loss Litigation.

    Current Status: Stayed pursuant to 11 U.S.C. § 362.

2. *W L Gore & Associates Inc vs. Surgery Specialty Clinicians Inc.*, Cause No. 202484254, 165th Dist. Ct., Harris County, Tex. (the "Gore Litigation");

    General Description: Breach of Contract.

    Current Status: Stayed pursuant to 11 U.S.C. § 362.

3. *El Paso Vinton Diagnostics PM vs. Eric Chan, MD*, Cause No. 202473116, 234th Dist. Ct., Harris County, Tex. (the "El Paso Litigation");

    General Description: Breach of Contract.

    Current Status: Order of Nonsuit signed October 7, 2025.

4. *Medline Industries, LP v. VCMC*, Case No. 25-cv-7163 (N. D. Ill. June 26, 2025) (the "Medline Litigation");

    General Description: Breach of Contract.

    Current Status: Stayed pursuant to 11 U.S.C. § 362.

5. *4301 Ventura Holdings, L.L.C., Abudel Abdellatif, M.D. and Imran Mohiuddin, M.D. v. Dynacq, Vista Land & Equipment, Vista Community Medical Center, and Eric K. Chan, MD*, Cause No. 202575713, 129th Dist. Ct., Harris County, Tex. (the "Ventura Litigation");

    General Description: Breach of Contract.

    Current Status: Stayed pursuant to 11 U.S.C. § 362.

6. *Bio-Medical Applications of Texas Inc v. Vista Community Medical Center LLC.*, Cause No. 202488833, 234th Dist. Ct., Harris County, Tex. ("Bio-Medical Litigation");

    General Description: Breach of Contract.

    Current Status: Stayed pursuant to 11 U.S.C. § 362.

7. *Sallee, Crystaline v. Vista Community Medical Center LLP d/b/a Surgery Specialty Hospitals*, Cause No. 202083494, 270th Dist. Ct., Harris County, Tex. ("Sallee Litigation");

    General Description: Personal Injury.

    Current Status: Order of Nonsuit signed April 2, 2024.

8. *Quan, Dennis v. Vista Community Medical Center LLP d/b/a Surgery Specialty Hospitals*, Cause No. 202215687, 189th Dist. Ct., Harris County, Tex. ("Quan Litigation");

    General Description: Quantum Meruit/Unjust Enrichment.

---

[1] The "Stop-Loss Litigation" includes the underlying cases consolidated on the Texas State Office of Administrative Hearings Docket Nos. 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 and 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.

Current Status: Order Dismissing for Want of Prosecution signed May 13, 2025.

9. *US Bank National Association d/b/a US Bank Equipment Finance v. Surgery Specialty Clinicians Inc.*, Cause No. 202263235, 152nd Dist. Ct., Harris County, Tex. ("US Bank Litigation");

General Description: Breach of Contract.

Current Status: Agreed Judgment entered April 15, 2025.

10. *McKesson Medical Surgical Inc. v. Vista Community Medical Center LLP*, Cause No. 202359610, 133rd Dist. Ct., Harris County, Tex. ("McKesson Litigation);

General Description: Breach of Contract.

Current Status: Order of Nonsuit signed July 24, 2024.

11. *Serene Concepts, LLC d/b/a Pinnacle Environmental Services v. Vista Community Medical Center, LLP*, Cause No. 23-DCV-304520, 458th Dist. Ct., Fort Bend County, Tex. ("Serene Litigation");

General Description: Breach of Contract.

Current Status: Agreed Judgment entered February 9, 2024.

12. *Elizabeth Schaible v. Gary M. Horndeski, MD; Surgery Specialty Hospitals of America – Southeast Houston, LLC*, Cause No. 2025DCV4960, County Court at Law No. 6, El Paso County, Tex. ("Schaible Litigation").

General Description: Personal Injury.

Current Status: Stayed pursuant to 11 U.S.C. § 362.

**Schedule 3.9**

**Permits**

| <u>Permit</u> | <u>Permit Holder</u> | <u>Issuing Authority</u> | <u>Permit No.</u> | <u>Expiration Date</u> |
|---|---|---|---|---|
| CIHQ Full Accreditation | VCMC | Center for Improvement in Healthcare Quality | 1250 | 03/01/2028 |
| Hospital License | VCMC | Texas Department of State Health Services | 006941 | 04/30/2026 |
| Texas Pharmacy License | VCMC | Texas State Board of Pharmacy | 19541 | 04/30/2027 |
| Medicare Enrollment | VCMC | CMS | 450831 (PTAN) | N/A |
| CLIA Certificate of Accreditation | VCMC | CMS | 45D0496271 | 12/22/2027 |
| Laboratory Accreditation | VCMC | Commission on Laboratory Accreditation (COLA) | 7481 | 08/19/2026 |
| DEA Certificate of Registration | VCMC | U.S. Drug Enforcement Agency | BV6277924 | 02/28/2029 |
| NPI | VCMC | CMS | 1891718789 | N/A |
| Food Establishment Permit | SSHA | City of Pasadena Department of Health | 01464 | 02/15/2027 |

4925-2858-2030.12

**Schedule 3.10(b)**

**Number of operating rooms, procedure rooms, and beds**

1. Number of Operating Rooms: Eight (8).

2. Number of Procedure Rooms: Zero (0).

3. Number of Beds: Thirty-seven (37).

**Schedule 3.10(d)**

**Physician Ownership**

| Shareholder | Ownership or Investment Interests |
|---|---|
| Chiu M. Chan | 47.78% |
| Ella Y. Chan | 11.33% |
| Kam Wah Cheng | 2.32% |
| Ping S. Chu | 1.95% |
| Bert Chan | 1.43% |
| Eric Chan | 1.41% |
| Ying Chu | 0.23% |
| Xiao H. Li & Immediate Family Members | 0.14% |
| **Total** | **66.59%** |

4925-2858-2030.12

**Schedule 5.4**

**Conduct of Business**

(b)      Letter dated March 10, 2026, from the Texas Health and Human Services Commission (Stephanie Muth, Executive Commissioner) to Surgery Specialty Hospitals of America Se Houston (Administrator) and the related State Forms for State Deficiencies for the Surgery Specialty Hospitals of American SE Houston from the Texas Health and Human Service Commission for the Date of Survey Completed on February 19, 2026, and Form Printed on March 10, 2026 with regard to the ongoing mold remediation effort.