**TRANSITION AGREEMENT**

THIS TRANSITION AGREEMENT (this "Agreement") is made and entered into as of March 20, 2026 (the "Effective Date"), by and between Legent Hospital Northwest Houston, LLC, d/b/a Legent North Houston Surgical Hospital ("New Owner") and Vista Community Medical Center, L.L.P., a Texas limited liability partnership ("Former Owner"). New Owner and Former Owner are each a "Party" and collectively, the "Parties" to this Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Asset Purchase Agreement.

**Preamble**

**WHEREAS**, Former Owner owned and operated a physician-owned surgical hospital located at 4301 Vista Road, Pasadena, TX 77504 (the "Hospital");

**WHEREAS**, pursuant to that certain Asset Purchase Agreement, dated as of March 20, 2026, by and between Former Owner and New Owner and the other parties thereto (the "Asset Purchase Agreement"), Former Owner conveyed substantially all the assets of the Hospital to New Owner effective as of March 20, 2026, other than the Excluded Assets and the GreyStreet Assets;

**WHEREAS**, New Owner and Former Owner have each filed a Medicare change of ownership application (the "CHOW Applications") (i) transferring the Medicare Number of the Hospital from Former Owner to New Owner and (ii) relocating the Hospital from its current address to 801 Bissonnet Street, Bellaire, Texas 77041 (the "New Location"), but such CHOW Applications remain pending as of the date hereof;

**WHEREAS,** guidance from the Centers for Medicare and Medicaid Services ("CMS"), including in its Claims Processing Manual 100-4m Chapter 10, and Program Integrity Manual 100-8, Chapter 15, provides that it is the responsibility of the old and new owners to coordinate any payment arrangements between themselves while the Medicare Administrative Contractor and the state agency are reviewing the CHOW Applications; and

**WHEREAS**, Former Owner and New Owner desire to enter into this Agreement to memorialize the payment arrangements following the Closing and while the CHOW Applications are processing.

**NOW, THEREFORE**, in consideration of the above and the mutual warranties, representations, covenants and agreements set forth herein, and for good and valuable consideration, the receipt and sufficiency of which the Parties each acknowledge, the parties agree as follows:

**ARTICLE 1**
**OBLIGATIONS OF THE PARTIES**

1.1     Billing License.     Subject to the terms, provisions and conditions set forth in this Agreement, effective as of the Closing, and to the extent allowed by applicable Law, Former Owner grants to New Owner a license (the "Billing License") to use Former Owner's billing identification information (which information shall include Former Owner's name, Medicare provider numbers, related national provider identifiers, federal employer identification number, and related billing information as may be reasonably necessary) for purposes of submitting claims to Medicare for services provided by New Owner at the New Location after the Closing, and related operational and billing purposes. Such Billing License shall be effective until CMS and the appropriate CMS Medicare Administrative Contractor approve the CHOW Applications and issue a tie-in notice/CHOW approval letter acknowledging that New Owner may be reimbursed for claims submitted using the Medicare numbers formerly associated with the Former

Owner. So long as such Billing License remains in effect, Former Owner shall not act to: (i) terminate or modify any of Former Owner's billing identification information except as required by applicable Law; (ii) close any bank accounts used by Former Owner prior to the Closing for purposes of receiving reimbursement; or (iii) cancel or modify any electronic funds transfer agreements with respect to Medicare. All amounts and monies collected in the name of Former Owner for services provided by New Owner after the Closing shall belong to New Owner, and any amounts or reimbursements received by Former Owner or the Sellers pursuant to such license shall be remitted on a weekly basis to New Owner by wire transfer to an account designed by New Owner.

1.2     Reporting; Access to Information.  From and after the Closing and for so long as the Billing License granted pursuant to this Agreement remains in effect (and thereafter with respect to any claims submitted during the term of the Billing License), Former Owner shall:

(a)     provide to New Owner, within ten (10) days after the end of each calendar month, a written report detailing all cash collections received by Former Owner from CMS following the Closing, and the status of any pending claims, denials, recoupments, adjustments, offsets, or audits, and any correspondence with CMS or the applicable Medicare Administrative Contractor relating thereto;

(b)     promptly (and in any event within three (3) business days) deliver to New Owner copies of all remittance advices, explanations of benefits, notices of denial, requests for information, audit notices, repayment demands, or other communications received from CMS, any Medicare Administrative Contractor, or any governmental authority relating to claims submitted under the Billing License;

(c)     provide New Owner with reasonable access, during normal business hours and upon reasonable notice, to all books, records, systems, bank account statements, and other documentation relating to claims submitted or reimbursements received pursuant to the Billing License;

(d)     furnish such additional information, documentation, and cooperation as New Owner may reasonably request from time to time in connection with billing, collections, compliance, audits, reconciliations, or governmental inquiries relating to Former Owner's billing identification information; and

(e)     shall maintain complete and accurate books and records relating to all claims submitted and amounts received pursuant to the Billing License in accordance with applicable Law and shall retain such records for at least the period required by applicable Law.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

2.1     Representations and Warranties of New Owner.  New Owner is duly organized, validly existing and in good standing as a Texas limited liability company.  New Owner has the full power and authority necessary to execute, deliver and perform its obligations under this Agreement.  This Agreement constitutes the legal, valid and binding obligations of New Owner, enforceable in accordance with its respective terms.

2.2     Representations and Warranties of Former Owner.  Former Owner is duly organized, validly existing and in good standing as a Texas limited liability partnership.  Former Owner has the full power and authority necessary to execute, deliver and perform its obligations under this Agreement.  This Agreement constitutes the legal, valid and binding obligations of Former Owner, enforceable in accordance with its respective terms.

127421.000002 4934-3623-4136.3

## ARTICLE 3
## COVENANTS

3.1     Confidentiality and Non-Disclosure.  Each Party hereto agrees (i) not to disclose this Agreement or any aspect of the discussions, negotiations, terms, status or conditions relating to this Agreement to any third party other than their respective affiliates, officers, directors, authorized employees and authorized representatives, in each case as necessary in order to facilitate the billing arrangements contemplated herein, and (ii) to cause and require all such persons to whom such information is disclosed to abide by the provisions of this Section 3.1.

3.2     Reasonable Assistance.  The Parties hereby agree to cooperate and comply in a timely manner with any and all requests for documentation or information that may reasonably be made by any Party or CMS in order to carry out the purposes of this Agreement.

3.3     HIPAA.  With respect to any information that constitutes "protected health information" ("PHI") within the meaning of the privacy and security regulations adopted by the Department of Health and Human Services pursuant to the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act, and the regulations adopted in connection therewith (collectively, "HIPAA"), New Owner and Former Owner agree to use and disclose PHI in compliance with HIPAA and applicable state law, as well as applicable New Owner and Former Owner policies and procedures. Concurrent with the execution of this Agreement, the Parties shall execute a business associate agreement in the form attached hereto as Exhibit B (the "BAA").

3.4     Compliance with Laws.  New Owner shall comply with all applicable laws, regulations and legal requirements in connection with its use and access of the Former Owner's billing identification information hereunder.

## ARTICLE 4
## TERM AND TERMINATION

4.1     Term.   This Agreement shall remain in full force and effect from the Closing Date until the earlier of (a) the date that the New Owner receive the tie in notice/CHOW correspondence from CMS indicating that the CHOW Applications have been approved or (b) the date New Owner terminates this Agreement upon written notice to Former Owner.

## ARTICLE 5
## MISCELLANEOUS

5.1     Governing Law; Severability.  This Agreement shall in all aspects be governed by and construed in accordance with the internal Laws of the State of Texas without giving effect to any choice or conflict of Law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Texas, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Law.

5.2     Notices.

127421.000002 4934-3623-4136.3

(a)     All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) when sent by email (with written confirmation of transmission), or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

All notices
to Former Owner:         Dynacq Healthcare, Inc.
                         4301 Vista Rd.,
                         Pasadena, Texas 77504
                         Attention:  Dr. Eric Chan
                         Email: eric.chan@dynacq.com

with a copy to (which does not constitute notice):

                         Dykema Gossett PLLC
                         5 Houston Center
                         1401 McKinney Street, Suite 1625
                         Houston, Texas 77010
                         Attention:  William Hotze and Dominique Douglas
                         Email:  whotze@dykema.com / ddouglas@dykema.com

All notices
to New Owner:            Legent Hospital Northwest Houston, LLC c/o PSN Services, LLC
                         4090 Mapleshade Lane, Suite 220
                         Plano, Texas 75093
                         Attention: Jordan Fowler; Jeff Peterson
                         Email: jfowler@legenthealth.com; jpeterson@legenthealth.com

                         with a copy (which shall not constitute notice) to:

                         McDermott Will & Schulte LLP
                         333 SE 2nd Avenue, Suite 4500
                         Miami, Florida 33131-2184
                         Attention: Danielle Golino, Esq.
                         Email: dgolino@mcdermottlaw.com

(b)     Any party hereto may change its address specified for notices herein by designating a new address by notice in accordance with this Section 5.2.

5.3     Entire Agreement.  This Agreement and the Asset Purchase Agreement constitute the entire agreement among the Parties and supersede any prior and contemporaneous understandings, agreements, representations and warranties (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.

127421.000002 4934-3623-4136.3

5.4     <u>Modifications and Changes</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party hereto. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant.

5.5     <u>Assignment; Binding Effect</u>.  This Agreement shall not be assignable by any Party without the prior written consent of the other Party.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, executors, administrators, successors and permitted assigns.

5.6     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile, email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

*[Signatures on next page]*

127421.000002 4934-3623-4136.3

IN WITNESS WHEREOF, this Agreement has been executed by the parties as of the day and year first above written.

**NEW OWNER:**

Legent Hospital Northwest Houston, LLC, d/b/a Legent North Houston Surgical Hospital

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name:  Jordan Fowler
Title:    Chief Executive Officer

**FORMER OWNER:**

Vista Community Medical Center, L.L.P., a Texas limited liability partnership

By:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Name:  Dr. Eric Chan
Title:   President and Chief Executive Officer

*[Signature Page to Transition Agreement]*

127421.000002 4934-3623-4136.1

**Exhibit A**

**BUSINESS ASSOCIATE AGREEMENT**

**THIS BUSINESS ASSOCIATE AGREEMENT** (this "**BA Agreement**") is made by and between Vista Community Medical Center, L.L.P., a Texas limited liability partnership (the "**Business Associate**") and Legent Hospital Northwest Houston, LLC, d/b/a Legent North Houston Surgical Hospital (**"Company"**) and is effective as of March 20, 2026 ("**Effective Date**"). Capitalized terms used in this BA Agreement without definition shall have the respective meanings assigned to such terms by the Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, the Health Information Technology for Economic and Clinical Health Act and their implementing regulations as amended from time to time (collectively, "**HIPAA**").

**RECITALS**

**WHEREAS,** the Company and Business Associate are parties to that certain Transition Agreement entered into contemporaneously herewith that require Business Associate to have access to Protected Health Information ("**PHI**") of the Company (the **"Transition Agreement**"); and

**WHEREAS,** the Company and Business Associate enter into this BA Agreement for the parties to comply with HIPAA.

**NOW THEREFORE,** in consideration of the mutual premises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Business Associate agree as follows:

**AGREEMENT**

**1.     GENERAL PROVISIONS**

1.1     <u>Effect</u>. The provisions of this BA Agreement shall control with respect to PHI that Business Associate receives from or on behalf of the Company, and the terms and provisions of this BA Agreement shall supersede any conflicting or inconsistent terms and provisions of the Transition Agreement, including all exhibits or other attachments thereto and all documents incorporated therein by reference, to the extent of such conflict or inconsistency. This BA Agreement shall not modify or supersede any other provision of the Transition Agreement.

1.2     <u>No Third Party Beneficiaries</u>. The parties have not created and do not intend to create by this BA Agreement any third party rights, including, but not limited to, third party rights for the Company's patients.

1.3     <u>Independent Contractor</u>. The Company and Business Associate acknowledge and agree that Business Associate is at all times acting as independent contractor of the Company under this BA Agreement and not as an employee, agent, partner, or joint venturer of the Company.

1.4     <u>HIPAA Amendments</u>. Any future amendments to HIPAA affecting business associate agreements are hereby incorporated by reference into this BA Agreement as if set forth in this BA Agreement in their entirety, effective on the later of the effective date of this BA Agreement or such subsequent date as may be specified by HIPAA.

127421.000002 4934-3623-4136.3

1.5     Regulatory References. A reference in this BA Agreement to a section in HIPAA means the section as it may be amended from time to time.

## 2.     OBLIGATIONS OF BUSINESS ASSOCIATE

2.1     Use and Disclosure of PHI. Business Associate may use and disclose PHI as permitted or required under the Transition Agreement, this BA Agreement, or as Required by Law, but shall not otherwise use or disclose any PHI. Business Associate shall not, and shall ensure that its employees, other agents, and contractors do not, use or disclose PHI received from the Company in any manner that would constitute a violation of HIPAA if so used or disclosed by the Company. To the extent Business Associate carries out any of the Company's obligations under HIPAA, Business Associate shall comply with the requirements of HIPAA that apply to the Company in the performance of such obligations. Without limiting the generality of the foregoing, Business Associate is permitted to use or disclose PHI as set forth below:

2.1.1     Business Associate may use PHI internally for Business Associate's proper management and administrative services or to carry out its legal responsibilities; and

2.1.2     Business Associate may disclose PHI to a third party for Business Associate's proper management and administration, provided that (1) the disclosure is Required by Law, (2) Business Associate makes the disclosure pursuant to an agreement consistent with this BA Agreement, or (3) Business Associate makes the disclosure pursuant to a written confidentiality agreement under which the third party is required to (A) protect the confidentiality of the PHI, (B) only use or further disclose the PHI as Required by Law or for the purpose for which it was disclosed to the third party, and (C) notify the Company of any acquisition, access, use, or disclosure of PHI in a manner not permitted by the confidentiality agreement.

2.2     Safeguards. Business Associate shall use appropriate safeguards to prevent the use or disclosure of PHI other than as permitted or required by this BA Agreement. In addition, Business Associate shall implement Administrative Safeguards, Physical Safeguards, and Technical Safeguards that reasonably and appropriately protect the Confidentiality, Integrity, and Availability of Electronic PHI that it creates, receives, maintains, or transmits on behalf of the Company. Business Associate shall comply with the HIPAA Security Rule with respect to Electronic PHI.

2.3     Minimum Necessary Standard. To the extent required by the "minimum necessary" requirements of HIPAA, Business Associate shall only request, use, and disclose the minimum amount of PHI necessary to accomplish the purpose of the request, use, or disclosure. Business Associate shall comply with the minimum necessary guidance to be issued by the Secretary pursuant to HIPAA and, to the extent practicable, shall not request, use, or disclose any Direct Identifiers (as defined in the limited data set standard of HIPAA).

2.4     Mitigation. Business Associate shall take reasonable steps to mitigate, to the extent practicable, any harmful effect (that is known to Business Associate) of a use or disclosure of PHI by Business Associate in violation of this BA Agreement or HIPAA.

2.5     Subcontractors. Business Associate shall enter into a written agreement meeting the requirements of 45 C.F.R. §§ 164.504(e) and 164.314(a)(2) with each Subcontractor (including, without limitation, a Subcontractor that is an agent under applicable law) that creates, receives, maintains, or transmits PHI on behalf of Business Associate. Business Associate shall ensure that the written agreement with each Subcontractor obligates the Subcontractor to comply with restrictions and conditions that are at least as restrictive as the restrictions and conditions that apply to Business Associate under this BA Agreement.

2.6    Reporting Requirements.

2.6.1    Business Associate shall, without unreasonable delay, but in no event later than five (5) business days after becoming aware of any acquisition, access, use, or disclosure of PHI in violation of this BA Agreement by Business Associate, its employees, other agents or contractors, or by a third party to which Business Associate disclosed PHI (each, an "**Unauthorized Use or Disclosure**"), report such Unauthorized Use or Disclosure to the Company.

2.6.2    Business Associate shall, without unreasonable delay, but in no event later than five (5) business days after becoming aware of any Security Incident, report it to the Company.

2.6.3    Business Associate shall, without unreasonable delay, but in no event later than five (5) business days after discovery of a Breach of PHI (whether secured or unsecured), report such Breach to the Company in accordance with 45 C.F.R. § 164.410.

2.7    Access to PHI. Within ten (10) business days of a request by the Company for access to PHI about an Individual contained in any Designated Record Set of the Company maintained by Business Associate, Business Associate shall make available to the Company such PHI for so long as Business Associate maintains such information in the Designated Record Set. If Business Associate receives a request for access to PHI directly from an Individual, Business Associate shall forward such request to the Company within five (5) business days.

2.8    Availability of PHI for Amendment. Within ten (10) business days of receipt of a request from the Company for the amendment of an Individual's PHI contained in any Designated Record Set of the Company maintained by Business Associate, Business Associate shall provide such PHI to the Company for amendment and incorporate any such amendments in the PHI (for so long as Business Associate maintains such information in the Designated Record Set) as required by 45 C.F.R. § 164.526. If Business Associate receives a request for amendment to PHI directly from an Individual, Business Associate shall forward such request to the Company within five (5) business days.

2.9    Accounting of Disclosures. Within ten (10) business days of notice by the Company to Business Associate that it has received a request for an accounting of disclosures of PHI (other than disclosures to which an exception to the accounting requirement applies), Business Associate shall make available to the Company such information as is in Business Associate's possession and is required for the Company to make the accounting required by 45 C.F.R. § 164.528. If Business Associate receives a request for an accounting directly from an Individual, Business Associate shall forward such request to the Company within five (5) business days.

2.10    Availability of Books and Records. Business Associate shall make its internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, the Company available to the Secretary for purposes of determining the Company's or Business Associate's compliance with HIPAA.

2.11    Restrictions. Business Associate shall comply with any reasonable restriction on the use or disclosure of PHI that the Company has agreed to or is required to abide by under 45 C.F.R. § 164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

3.    **TERMINATION OF AGREEMENT**

3.1    Termination Upon Breach of this BA Agreement. Any other provision of the Transition Agreement notwithstanding, the Company may terminate the Transition Agreement and this BA Agreement

upon thirty (30) days advance written notice to Business Associate in the event that Business Associate breaches this BA Agreement and such breach is not cured to the reasonable satisfaction of the Company within such thirty (30)-day period; provided, however, that in the event that termination of this BA Agreement is not feasible, in the Company's sole discretion, the Company may report the breach to the Secretary.

3.2     Return or Destruction of PHI upon Termination. Upon expiration or earlier termination of the Transition Agreement or this BA Agreement, Business Associate shall either return or destroy all PHI received from the Company or created or received by Business Associate on behalf of the Company and which Business Associate still maintains in any form. Notwithstanding the foregoing, to the extent that the Company reasonably determines that it is not feasible to return or destroy such PHI, the terms and provisions of this BA Agreement shall survive termination and such PHI shall be used or disclosed solely for such purpose or purposes that prevented the return or destruction of such PHI.

## 4.     COUNTERPARTS

This BA Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which together shall constitute one and the same instrument. Copies of signatures sent by facsimile transmission or scanned and sent by email are deemed to be originals for purposes of execution and proof of this Agreement.

**(Signatures on following page)**

327420070002  4934-3623-4136.3

**IN WITNESS WHEREOF**, each party hereto has caused its duly authorized representative to execute this BA Agreement as of the date first set forth above.

**COMPANY:**

Legent Hospital Northwest Houston, LLC, d/b/a Legent North Houston Surgical Hospital

By: _Jordan Fowler_ C7181A8946E248C...

Name:  Jordan Fowler
Title:    Chief Executive Officer

**BUSINESS ASSOCIATE:**

Vista Community Medical Center, L.L.P., a Texas limited liability partnership

By: A2C249D64FCA4DE...

Name:  Dr. Eric Chan
Title:   President and Chief Executive Officer

*[Signature Page to Business Associate Agreement]*

127421.000002 4934-3623-4136.1